# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| Museum of American Jewish History, d/b/a National Museum of American Jewish History | : Case No. 20- |
| | : |
| Debtor. | : |

## DECLARATION OF PAUL WAIMBERG
## IN SUPPORT OF FIRST DAY MOTIONS

I, Paul Waimberg, hereby declare under penalty of perjury:

1.  I am the Chief Financial Officer of the Museum of American Jewish History, d/b/a/ National Museum of American Jewish History (the "Museum" or the "Debtor"), a Pennsylvania non-profit corporation and the debtor and debtor-in-possession in the above-captioned chapter 11 case. In this capacity, I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

2.  On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtor is operating its organization and managing its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no official committees have been appointed or designated.

3.  To enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to transition into chapter 11 and minimize disruption of its operations, thereby preserving and maximizing the value of the

121062224_9

Debtor's estate. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

4. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtor's operations, its corporate and debt structure and the circumstances surrounding the commencement of this chapter 11 case. Part II sets forth the relevant facts in support of each of the First Day Motions.

## I.    BACKGROUND

### A.    The Debtor's Corporate Structure

6. The Debtor is a Pennsylvania non-profit organization which operates the National Museum of American Jewish History, the only museum in the nation dedicated exclusively to exploring and interpreting the American Jewish experience. The Museum presents educational and public programs that preserve, explore and celebrate the history of Jews in America. The address of the Museum is 101 S. Independence Mall East, Philadelphia, PA 19106. The Debtor has no shareholders or partners.

**B.    Overview and Nature of Debtor's Operations**

7. The Museum presents educational programs and experiences that preserve, explore, and celebrate the history of Jews in America. Its purpose is to connect Jews more closely to their heritage and to inspire in people of all backgrounds a greater appreciation for the diversity of the American Jewish experience and the freedoms to which Americans aspire.

8. The Museum was established in 1976, and is situated on Philadelphia's Independence Mall. The Museum was originally founded by the members of historic Congregation Mikveh Israel, which was established in 1740 and known as the "Synagogue of the American Revolution".

9. The Museum has long been a vital component in the cultural life of Philadelphia. During the course of its history, the Museum has attracted a broad regional audience to its public programs, while exploring American Jewish identity through lectures, panel discussions, authors' talks, films, children's activities, theater, and music.

10. The Museum has displayed more than a hundred exhibitions in its first three decades-plus of existence. As the repository of the largest collection of Jewish Americana in the world, with more than 30,000 objects, the Museum has developed extensive institutional experience in preservation, conservation and collections management supporting the fulfillment of its mission to preserve the material culture of American Jews.

11. The Museum is a Smithsonian Affiliate. As a Smithsonian Affiliate, the Museum has access to the Smithsonian Institution's collections and resources, permitting it to borrow artifacts from the Smithsonian's estimated 142-million-piece collection – from colonial Judaic artifacts and historic documents to fine art and objects of contemporary significance – to be shown as part of special exhibitions or to be incorporated into the core exhibition.

12. This affiliation also allows the Museum to take advantage of the Smithsonian's educational resources and expertise in the areas of conservation, collections care and exhibit development for both staff training and consultation, and to call upon Smithsonian experts to present programs on behalf of the Museum, as has already been done with great success. Museum members also have the opportunity to become Smithsonian Affiliate members at a minimal additional cost.

13. The Debtor generates its revenues through a combination of sales of memberships and tickets to the Museum, event revenue, endowment income, and charitable contributions. Operationally, the Debtor generates sufficient revenues from memberships, individual tickets, and other sales and services to cover only a small portion of its expenses.

14. Historically, the Museum has generated approximately 20% of its operating budget from earned revenue, and relies heavily on contributed revenue. While contributed revenues – particularly those from individual donors – vary from year to year, the Museum believes, based on discussions with potential donors, that a principal reason for such inconsistency in contributions is the debt burden carried by the Museum.

15. The Debtor intends to restructure its debt through this Chapter 11 Case so that its debt service is reduced to a level that will allow the Museum to sustain its operations for the long term.

C. **The Debtor's Debt Structure**

16. Pursuant to a Trust Indenture dated as of June 30, 2015 (the "Trust Indenture") between the Philadelphia Authority for Industrial Development (the "Authority") and T.D. Bank, N.A., as trustee (the "Indenture Trustee"), the Authority issued Revenue Bonds in the aggregate principal amount of $30,750,000 (the "Bonds") to provide funding to the Museum.

17. Pursuant to a Loan and Security Agreement also dated as of June 30, 2015, between the Authority and the Museum (the "Loan Agreement"), the proceeds of the Bonds were loaned to the Museum in order to refinance the construction loan, which financed the construction of the Museum building, fund certain reserves, and fund interest and certain costs associated with the Bonds. The bonds consist of Series 2015 A in the original principal amount of $17,000,000, and Series 2015 B, in the total original principal amount of $13,750,000. The Series 2015A Bond is held by BNB Bank, formerly known as Bridgehampton National Bank. The Series 2015B Bonds are held by approximately 12 individuals and/or trusts or foundations, many of whom are insiders of the Debtor.

18. Additionally, pursuant to the Loan Agreement, the Museum granted security interests in certain collateral to the Indenture Trustee.

19. On information and belief, the Indenture Trustee asserts that under the Loan Agreement, the Museum pledged among other things, certain personal and fixture property including accounts, chattel paper, letter of credit rights, and other property, Loan Agreement at § 3.3, with the exception of certain property intended for exhibition, education or research at the Museum.

20. As of the Petition Date, the principal amounts outstanding under the Bonds consisted of approximately $16.3 million to the Series 2015A Bond Holder and approximately $13.75 million to the Series 2015B Bondholders.

21. As of October 18, 2019, T.D. Bank, N.A. resigned as Indenture Trustee for the Bonds and UMB Bank, National Association was appointed as the Indenture Trustee.

**D.    Events Leading to the Commencement of the Chapter 11 Cases**

22. The Museum was originally located at 44 North 4th Street in Philadelphia, and shared a building with Congregation Mikveh Israel. In 2005, the Museum announced that it

5

121062224_9

would be moving to its current location on Independence Mall, and the project to build the Museum broke ground in September 2007. The project was funded through a combination of donations and a construction loan, which was refinanced in 2015 (resulting in the existing Bonds, in the principal amount of $30,750,000). The Museum ultimately opened to the public at the end of 2010. The Museum's current location is significantly larger than the Debtor's previous location.

23. Since opening in 2010, the Museum's revenues from gate receipts and events have been inconsistent. Accordingly, in 2017, the Museum reduced its operating expenses by eliminating some paid positions and by making other expense reductions. However, following such reduction in operating expenses, the Museum's revenues have remained at a level which is insufficient to fully fund its expenses and its debt service.

24. By early 2019, it became apparent to the Board that the Museum would be unable to remain current on its Series 2015A and 2015B Bond obligations given the significant debt service requirements and terms under the Trust Indenture. Accordingly, in May, 2019, the Board initiated discussions with representatives of the Series 2015A and 2015B Bonds regarding the restructuring of the Bond debt. The Board has engaged in numerous discussions and negotiations with representatives of the Series 2015A and 2015B Bonds over the course of nine months in an attempt to restructure the bonds.

25. Unfortunately, the discussions did not yield the necessary restructuring of the Series 2015A and 2015B Bonds, and the Museum remains in a situation where its revenues are insufficient to cover its expenses and debt service. Additionally, the burden of the Bond obligations has proven to be an impediment to the Debtor's ability to raise funds, as potential donors are reluctant to donate to an entity saddled with the Bond obligation.

26. As a result of the Debtor's inconsistent operating revenues, inconsistent donations (because of the inability to repay the Bond debt), and its inability to restructure the Bond debt outside of bankruptcy, the Debtor made the difficult decision to file this Chapter 11 bankruptcy case.

### E. Desired outcomes for Chapter 11 process

27. The Debtor believes that the Chapter 11 filing is the path that will best allow it to secure the future of the Museum and ensure that it continues to serve the community for many more years to come.

28. To that end, the Debtor seeks in the chapter 11 process to achieve relief from Bond obligations through a court-approved plan of reorganization and to thereby attract donor support.

## II. MOTIONS FILED ON THE PETITION DATE[1]

### A. Application of the Debtor Pursuant to Section 327(a) of the Bankruptcy Code for Authority to Employ Dilworth Paxson LLP as Counsel for the Debtor (the "Dilworth Retention Application")

29. By the Dilworth Retention Application, the Debtor seeks to retain Dilworth Paxson LLP ("Dilworth") as counsel pursuant to section 327(a) of the Bankruptcy Code because Dilworth has extensive experience and knowledge in the field of debtor's and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Additionally, Dilworth possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts in Pennsylvania.

---

[1] Capitalized terms not defined herein are ascribed the meaning given to them in their respective motions.

121062224_9

30. In preparing for its representation of the Debtor in this case, Dilworth has become familiar with the Debtor's business and affairs and many of the potential legal issues which may arise in the context of this Chapter 11 Case.

31. The Debtor believes that the employment of Dilworth is appropriate and necessary to enable the Debtor to faithfully execute its duties as Debtor and Debtor-in-possession, and to implement the restructuring and reorganization of the Debtor. Accordingly, the Debtor believes that Dilworth is both well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner.

32. The Debtor does not seek an expedited hearing with respect to the Dilworth Retention Motion or other professional retention motions except its claims agent.

**B.  Application of Debtor For An Order Authorizing Employment and Retention of Donlin, Recano & Company, Inc. As Notice and Claims Agent ("Donlin, Recano Retention Application")**

33. By the Donlin Recano Retention Application, the Debtor seeks authority to retain Donlin Recano as claims and noticing agent.

34. Donlin Recano is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases. Indeed, Donlin Recano has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest. Further, Donlin Recano will work with the Clerk's Office to ensure that such methodology conforms with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

121062224_9

35. Donlin Recano has substantial experience in matters of this size and complexity and has acted as the official notice, claims and solicitation agent in many large bankruptcy cases in this circuit and other circuits nationwide.

36. Retention of Donlin Recano will facilitate the efficient administration of this bankruptcy case and will relieve the Debtor and its counsel from devoting time and attention to noticing and related issues. As a result, the Debtor will incur reduced counsel fees.

### C. Motion of the Debtor for Entry of an Order Authorizing the Debtor to Maintain and Renew Prepetition Insurance Policies and Pay all Obligations in Respect Thereof (the "Insurance Motion")

37. In connection with the operation and management of its organization, the Debtor maintains numerous insurance policies, providing coverage for, among other things, Commercial Property Liability, General Liability, Fine Arts Permanent Collection Liability, Transit & Exhibition Liability, Umbrella/Excess Liability, Executive Risk Liability, Crime Liability, and Cyber Liability (collectively, the "Insurance Policies").

38. By the Insurance Motion, the Debtor requests authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtor determines, in its discretion, that payment is necessary or appropriate.

### D. Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utility Motion")

39. In connection with the operation of its organization, the Debtor obtains electric, water, telephone, internet and other similar utility services provided by a number of utility companies (the "Utility Providers"). The Utility Providers service the Debtor's Museum facility in Philadelphia, Pennsylvania. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Indeed, any

interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to run the Museum, thereby negatively impacting the Debtor's membership, donors, customers, revenues, and profits. Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, its operation and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this Chapter 11 Case.

40. By the Utility Motion, the Debtor seeks the entry of interim and final orders: (a) determining that its Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures; (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by this Motion.

41. Because the Debtor has kept current on the payment of utility bills, a deposit equal to two weeks of average service is adequate.

    **E.**    **Motion for an Order (A) Authorizing the Debtor to Pay Certain Pre-petition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtor May Continue Pre-petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Wage Motion")**

42. To minimize the personal hardship that the Debtor's employees would suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, by the Wages Motion,

the Debtor seeks authority to pay and honor, in its sole discretion, certain pre-petition claims for, among other items: wages, salaries, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health benefits, insurance benefits, workers' compensation benefits, life insurance, PTO, disability coverage, floating holidays and all other benefits that the Debtor has historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

43. Additionally, in an abundance of caution, the Debtor requests the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this chapter 11 case in its sole discretion without the need for further Court approval.

44. The Debtor will not pay any prepetition wage claims over the priority limit of 11 U.S.C. § 507(a)(4) (currently $13,650).

### F. Motion for Entry of an Order Authorizing the Debtor to (I) Continue Cash Management System and (II) Waiving Certain United States Trustee Requirements (the "Cash Management Motion")

45. By the Cash Management Motion, the Debtor seeks entry of an order authorizing the Debtor to (i) continue to use its existing cash management system, (ii) waiving certain United States Trustee requirements and (iii) granting related relief. The Debtor also requests that the Court authorize the Debtor's banks to continue to maintain, service and administer certain Bank Accounts.

46. The use of the Cash Management System is essential to maintaining the Debtor's operations during this case and, therefore, to maximizing the value of the Debtor's estate. The Debtor uses the Cash Management System to collect receivables from its operations, collect donations, pay down debts, pay vendors, manage and support its business operations, and pay its

11

payroll company. The Cash Management System also serves a strategic function, facilitating the Debtor's cash monitoring, forecasting, and reporting.

### G.  Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Motion")

47. By the Case Management Motion, the Debtor seeks entry of an order establishing certain notice, case management, and administrative procedures (the "Case Management Procedures"), which include the following: (a) limiting notice to Museum members and Artifact Lenders so that they receive written notice of the commencement of the case only; (b) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)–(6) will be served upon a specified list of parties and those creditors who file with the Court a request that they receive such notices pursuant to Bankruptcy Rule 2002; (c) allowing electronic service of all documents (except complaints and summonses); and (d) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court. The Debtor further requests that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to this Chapter 11 Case to the extent that they do not conflict with the Case Management Procedures. This will provide for effective and streamlined case management procedures, which are necessary to keep administrative expenses to a minimum.

### H.  Motion for an Order (A) Authorizing but Not Directing the Debtor to Remit and Pay Prepetition Taxes and (B) Authorizing And Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Taxes Motion")

48. In the ordinary course of its business, the Debtor collects and remits sales taxes incurred in connection with the sale of goods from the Museum's store (the "Taxes"). Generally, sales taxes collected from customers are remitted to appropriate taxing Authorities in the month following collection.

49. If the Debtor does not pay the Taxes, the respective Authorities may take actions that could have a wide-ranging and adverse effect on the Debtor's operation as a whole. Accordingly, by the Taxes Motion, the Debtor seeks authority, in its sole discretion, to pay Taxes without regard to whether such obligations accrued or arose before or after the Petition Date.

50. The Debtor believes that payment of the Taxes is appropriate in this Chapter 11 Case, where the outstanding tax liabilities are for trust fund taxes that the Debtor has collected and holds in trust for the benefit of the Authorities. These funds do not constitute property of the estate and could not otherwise be used by the Museum.

**I.  Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs ("Extension Motion")**

51. Pursuant to the Extension Motion, the Debtor seeks the entry of an order extending the time to file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statement of financial affairs and related documents required by the Bankruptcy Code and the Local Bankruptcy Rules for the Eastern District of Pennsylvania (the "Schedules and Statements").

52. The Debtor has begun, but has not yet finished, compiling the information that will be required in order to complete the Schedules and Statements. Due to the complexity of the Debtor's business, the Debtor seeks an extension of time in order to prepare its Schedules and Statements.

**J.  Motion of Debtor for Order Authorizing Use of Cash Collateral (the "Cash Collateral Motion")**

53. The Debtor has an urgent need for the immediate use of cash collateral following the filing of the Petition. Indeed, access to the use of pre-petition cash collateral in the form of pre-petition accounts receivable is essential to ensure that the Debtor can fund its immediate

13

post-petition operating requirements and other financial obligations. Absent the ability to use cash collateral, the Debtor will not be able to pay wages, insurance, and other critical expenses incident to the Museum's operation.

54. The Debtor believes that the expenses reflected on the Initial Budget submitted with the Cash Collateral Motion (the "Initial Budget") represent the minimum reasonable and necessary business expenses that must be paid in order for the Museum to remain in operation and continue serving its important community function. Absent the immediate and continued funding of these essential operating and administrative costs, the Debtor would suffer irreparable harm at the very outset of this case.

55. Without approval of the use of cash collateral, the Debtor will not be able to continue operating, and will instead be forced to wind down its operations rather than resuscitate them. Uninterrupted access to working capital is critical to maintain the Museum's employee workforce, infrastructure, status as a community treasure and cultural resource, and the preservation of estate assets for the benefit of all creditors and parties in interest.

56. Accordingly, by the Cash Collateral Motion, the Debtor seeks authority to use cash collateral consistent with the Initial Budget.

Dated: March 1, 2020　　　　　　　　　Museum of American Jewish History, d/b/a
　　　　　　　　　　　　　　　　　　　National Museum of American Jewish History

　　　　　　　　　　　　　　　By:　　/s/ Paul Waimberg
　　　　　　　　　　　　　　　　　　Chief Financial Officer