**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| Museum of American Jewish History | : |  |
| d/b/a National Museum of American | : |  |
| Jewish History, |  |  |
| Debtor. | : | Bankruptcy No. 20-11285-MDC |

# O P I N I O N

BY: MAGDELINE D. COLEMAN, CHIEF UNITED STATES BANKRUPTCY JUDGE

## I.     INTRODUCTION

Before the Court for disposition is the *Debtor's Motion for Entry of an Order Determining the Value of the Debtor's Real Property* (the "Valuation Motion").[1]  By the Valuation Motion, the Museum of American Jewish History d/b/a National Museum of American Jewish History (the "Debtor") seeks an order, pursuant to §506(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), determining the value of the Debtor's real property (the "Property") for the purpose of determining the extent of its secured creditors' lien on the Property.  For the reasons set forth below, the Court finds that the value of the Property is $66,000,000.00.

---

[1] Bankr. Docket No. 252.

II.    **RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**[2]

A.    **The Debtor and the Property**

The Debtor is a Pennsylvania non-profit organization which operates the National

Museum of American Jewish History (the "Museum").  The Museum presents educational and

public programs that preserve, explore and celebrate the history of Jews in America.

The Debtor owns the Property upon which the Museum sits, located at 101 South

Independence Mall East in Philadelphia, Pennsylvania.  The Property consists of 0.51 acres of

land, and the Museum building totals 103,585 square feet spanning six floors, including a below

grade concourse.

In 2005, the Museum announced that it would be moving from its prior location to the

current location at the Property.  The Debtor acquired the land at the Property in 2006 at a cost of

$9,505,000.00, and broke ground in 2007.  At the time of the acquisition an office building was

located at the Property.  The Debtor demolished the office building and constructed the

improvements on the Property to be used as the Museum, for a cost of at least $83 million.  The

Museum was completed and opened to the public in 2010, and since that time the Property has

been occupied primarily by the Debtor to operate the Museum.

B.    **The Issuance of the Bonds Secured by the Property**

The Debtor's acquisition of the Property and construction of the Museum was funded

through a combination of donations and a construction loan from TD Bank, N.A. ("TD Bank").

In 2015, the Museum undertook a refinancing of the construction loan.  The Philadelphia

Authority for Industrial Development (the "Issuer") issued and delivered two series of Revenue

---

[2] The factual and procedural background are drawn from the Parties' pleadings, uncontested facts set forth in the Joint Pretrial Statement [Bankr. Docket No. 341], the docket in the Debtor's bankruptcy case, and the record of the Hearing.

Bonds (together, the "Bonds"): (i) Series 2015A, in the original principal stated amount of

$17,000,000.00 (the "Series A Bond"); and (ii) Series 2015B, in the original principal stated

amount of $13,750,000.00 (the "Series B Bonds").  The loan proceeds from the Bonds were

issued pursuant to a Loan and Security Agreement (the "Loan Agreement") between the Debtor

and the Issuer, and were to be applied towards the payoff of the construction loan from TD Bank

and certain costs of issuance of the Bonds.  Upon issuance of the Bonds, TD Bank served as the

Indenture Trustee under the Trust Indenture for the Bonds (the "Indenture").

     In connection with the issuance of the Bonds, the Debtor executed (i) a Promissory Note

in favor of the Issuer in the principal amount of $17,000,000.00 (the "Series A Note"), and (ii) a

Promissory Note in favor of the Issuer in the original principal amount of $13,750,000.00 (the

"Series B Note," and together with the Series A Note, the "Notes").  The Debtor's obligations

under the Bonds, the Loan Agreement, and the Notes are secured by a Mortgage (the

"Mortgage," and together with the Bonds, the Loan Agreement, and the Notes, the "Loan

Documents") executed by the Debtor in favor of the Indenture Trustee and granting the Indenture

Trustee a mortgage lien on the Property.[3]

     BNB Bank (the "A Bondholder") is the holder of the Series A Bond.  The Series B Bonds

are held by eleven individuals, trusts, or foundations (collectively, the "B Bondholders," and

together with the A Bondholder, the "Bondholders").[4]  On or about June 30, 2015, all rights of

the Issuer under the Loan Documents were assigned to TD Bank as Indenture Trustee.  Effective

---

[3] The nature and extent of the Indenture Trustee's asserted liens against the Debtor's personal property
has not been determined and is not the subject of the Valuation Motion.  Those issues are the subject of a
pending adversary proceeding the Trustee has filed in Adversary Proceeding Number 20-00267.

[4] The B Bondholders are Ronald Rubin, Stephen Cozen, Mitchell Morgan, Connie Williams, Etta
Winigrad, Richard Witten, Philip Darivoff, Joseph Zuritsky, The Robert Saligman Charitable Foundation,
Lyn M. Ross Charitable Remainder Trust, and The Sidney Kimmel Revocable Trust.

as of October 18, 2019, TD Bank resigned as Indenture Trustee, and the Issuer appointed UMB

Bank, N.A. (the "Trustee," and together with the Debtor and the Bondholders, the "Parties") as

Successor Trustee under the Indenture.

### C.    The Debtor's Bankruptcy Case, the Plan, and the Valuation Motion

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code

on March 1, 2020 (the "Petition Date"), together with a proposed plan (as amended, the "Plan").[5]

As of the Petition Date, the principal amount outstanding under the Series A Note was $16.3

million, and the principal amount outstanding under the Series B Note was $13.75 million.  The

Trustee has filed a Proof of Claim asserting a secured claim on behalf of all Bondholders in the

amount of $31,068,209.23 (the "Proof of Claim").[6]

On June 23, 2020, the Debtor filed its first amended version of the Plan.[7]  The Plan has

subsequently been further amended three times,[8] such that the Debtor's Fourth Amended

Chapter 11 Plan is currently proposed for confirmation.  Pursuant to the Plan, the Debtor intends

to retain the Property and continue to operate it as the Museum.  The Debtor proposes to pay the

A Bondholder a total of approximately $6,500,000.00, payable by $1,500,000.00 over ten years,

with a $4,000,000.00 balloon payment at the end of that 10-year term.  The Debtor proposes to

pay the B Bondholders $100,000.00 in total.

On July 23, 2020, the Debtor filed the Valuation Motion.  The Debtor represented in the

Valuation Motion that it had obtained an appraisal of the Property in September 2019 which

---

[5] Bankr. Docket Nos. 1, 17.

[6] Proof of Claim No. 25.  In their Joint Pretrial Statement, the Parties state as an uncontested fact that the Trustee's Proof of Claim "is asserted in amount not less than $31 million."  See Bankr. Docket No. 341.

[7] Bankr. Docket No. 218.

[8] Bankr. Docket Nos. 270, 293, 353.

valued the Property at $10,150,000.00, and asserted that, in light of the subsequent drop in real property values in Center City Philadelphia due to COVID-19, the Property is appropriately valued at $10,150,000.00 or less.  The Debtor further represented that the Trustee believes the Property's value is $29,900,000.00, based on a January 2018 appraisal obtained by the A Bondholder.  As such, the Debtor represented, "[b]ecause the parties ascribe vastly different values to the Real Property, the value of the Real Property is a critical issue with respect to confirmation of a plan."  The Debtor therefore seeks a determination of the value of the Property prior to confirmation of the Plan.[9]

At a hearing in the Debtor's bankruptcy case on July 29, 2020, at which the Valuation Motion was discussed, it was evident to the Court that the Trustee and the A Bondholder intended to contest the Valuation Motion and that an evidentiary hearing would be required. Therefore, on July 31, 2020, the Court entered a Scheduling Order with respect to the Valuation Motion and scheduled the matter for an evidentiary hearing (the "Hearing") commencing on September 22, 2020.[10]

### D.    The Hearing and the Evidence Presented

The Hearing on the Valuation Motion was held over the course of six days.[11]  The Court heard testimony from six expert witnesses and two fact witnesses, and admitted 23 documents into evidence, including reports from each of the expert witnesses.  At the conclusion of the

---

[9] A hearing to consider confirmation of the Plan is scheduled for December 14, 2020.  Although the Plan has been amended three times since the Valuation Motion was filed, valuation of the Property remains central to whether the Plan as formulated will be confirmed.

[10] Bankr. Docket No. 273.

[11] The Hearing was held on September 22 to 24, 2020, September 29, 2020, October 6, 2020, and October 13, 2020.

Hearing, the Parties were given the opportunity to file post-Hearing submissions for the Court's consideration, which the Parties did on November 3, 2020.[12]

Before summarizing the expert testimony adduced at the Hearing and the expert reports where applicable, the Court believes it is useful to set forth a brief explanation of the potential methods of valuation that could be employed to value the Property. Appraisers develop an opinion of the value of property using one or more of three methods of valuation: the sales comparison approach, the income capitalization approach, and the cost approach.[13] The propriety or impropriety of each of the methods with respect to valuing the Property here was the subject of significant testimony at the Hearing.

The sales comparison approach values a property using data from recent sales and/or listings of comparable properties in the market.[14] The appraiser accounts for material differences between the comparable properties and the subject property, including both economic and physical elements, and makes adjustments to value accordingly.[15] Those adjustments are reflected in "unit rates" for each property which then are reconciled to make a value conclusion regarding the subject property.[16]

The income capitalization approach values a property using data to capitalize anticipated future income from the subject property.[17] An appraiser first calculates the net operating income a property could be expected to generate.[18] The net operating income is then divided by a

---

[12] Bankr. Docket Nos. 410, 411, 412, and 414.

[13] See BNB/UMB Exhibit F, at NMAJH000693 to 694; Hearing Transcript at 467:19 to 467:22.

[14] See BNB/UMB Exhibit F, at NMAJH000693.

[15] Id.

[16] Hearing Transcript, 43:3 to 43:11.

[17] See BNB/UMB Exhibit F, at NMAJH000694.

[18] Hearing Transcript, 43:3 to 43:12 to 44:10.

capitalization rate, which results in a value figure.[19]  Costs that will be incurred in order to

achieve stabilized income, meaning income from a property that is rented consistent with the

market, are then deducted from the value figure.[20]

The cost approach values a property based on the sum of current depreciated replacement

or reproduction cost of the property, together with land value and an appropriate incentive or

profit figure, where applicable.[21]

### 1.    The Debtor's Expert Opinions on the Property's Value

### a.    Reeves C. Lukens ("Lukens")

Lukens is a certified appraiser employed by Valbridge Property Advisors, with 28 years

of experience appraising real estate.  He was qualified at the Hearing as an expert as to the value

of commercial real estate.  Lukens conducted an appraisal of the Property starting in the summer

of 2019 and submitted an expert report on the value of the Property that consisted of his 2019

appraisal report, as updated in 2020.  Lukens testified that in performing his appraisal his goal

was to determine its market value, i.e., how much the property would sell for if it were exposed

to the market.[22]  In doing so, Lukens considered the property a special purpose property,

meaning that it is used for a purpose that falls outside the typical retail, industrial, residential, or

office properties and therefore has a limited market.[23]  Lukens testified that he has appraised

---

[19] *Id.*

[20] *Id.*

[21] See BNB/UMB Exhibit F, at NMAJH000693; Hearing Transcript, 467:15 to 468:4.

[22] In his appraisal report and at the Hearing, Lukens defined market value as "The most probable price
that property should bring in, in a competitive and open market where the buyer and seller are each acting
prudently and knowledgeably in assuming a price not affected by undue stimulus."  Lukens testified that
this definition is commonly used in every financing appraisal and is required in federally regulated
transactions pursuant to Title 12 of the Code of Federal Regulations.  Hearing Transcript, 41:20 to 42:17.

over 100 special purpose properties in his career, though the Property was his first purpose-built museum.

### i.      Lukens' "Highest and Best Use" Methodological Assumption

Lukens concluded that the value of the Property is $10,500,000.00.  Although Lukens was aware that the Debtor operates the Property as a Museum and intends to continue doing so under the Plan, he testified that he valued the Property based on what he determined to be its "highest and best use" because it will produce the maximum value.  Lukens was not directed to value the Property based on anything but its highest and best use, but agreed that if he was told it needed to be valued according to something other than its highest and best use he would have done that.

Lukens concluded that the highest and best use of the Property would be as a mixed-use office development.[24]  Lukens testified that, in determining the Property's highest and best use, he considered whether it could continue to be used as a museum or as apartments, but concluded that those uses were undesirable based on a number of factors, including that finding another museum user was highly unlikely, scant data on museum sales rendered any estimate of market value unreliable, and height restrictions at the Property made conversion to apartments unworkable.[25]  While Lukens did not value the Property as a museum, he did reach the conclusion that its value would be lower than its highest and best use.  Lukens also testified that a property cannot be worth more than its highest and best use value unless the entity occupying

---

[24] Lukens testified that an appraiser determines a property's highest and best use by "looking at what is legally permissible on site.  What would zoning allow.  What [is] physically possible on the site, what would the site accommodate.  What's financially feasible.  What economic uses would work on the site, and then what's maximally productive."  Hearing Transcript, 47:22 to 48:9.

[25] The Property is subject to the Independence Hall zoning overly, which caps its height at 45 feet.  *Id.* at 49:23 to 50:3.

the property adds intrinsic value not reflected in the highest and best use value, which he stated is not the case with a non-profit museum.

Lukens acknowledged that it is theoretically possible that a potential purchaser of the Property exists who wants to use the Property for a museum, but believed that would have no effect on the valuation because that purchaser would, consistent with their own economic interests, still pay no more than a *de minimis* amount above the value of the Property at its highest and best use in order to beat out a highest and best use purchaser.  Lukens' opinion was that if the Property were required to remain as a museum, there would be a severe discount to its value because purchasers in the market for its highest and best use as an office building have been removed.

### ii.    Lukens Employed the Comparable Sales and Income Capitalization Approaches to Valuation

Once Lukens determined that the highest and best use of the Property was adaptive reuse as an office building, he considered the three general approaches to value real estate: (i) the sales comparison approach, (ii) the income capitalization approach, and (iii) the cost approach. Lukens determined to use only the sales comparison approach and the income capitalization approach, which he believes are the most reliable approaches.  Lukens testified that he did not undertake a cost approach valuation, which he believed was the least common of the three, because the Uniform Standards of Professional Appraisal Practice ("USPAP") governing appraisals of real estate in Pennsylvania require that depreciation be calculated from available sales data.  Because museum sales are not available from which to extract depreciation, Lukens did not use the cost approach.  Lukens also testified that his value analysis for the Property did not take into account how much the Debtor incurred to build the Museum because it is a special

purpose property, and consequently there are very few buyers that value the special purpose

property the way the developer did.

### iii.    Lukens' Sales Comparison Valuation

Lukens initiated the sales comparison valuation by identifying what he determined to be

comparable sales properties within Center City Philadelphia, taking into consideration that the

Museum would require "repositioning" to be used as a mixed-used office development.  Lukens

selected five properties that had been sold between 2014 and 2017.[26]  He then calculated various

quantitative adjustments to their sales prices, both downward and upward, based on multiple

factors, including physical, market, and transactional differences from the Debtor's Property.[27]

Based on those adjusted sale prices, Lukens concluded that the Property had a "unit value" of

$100 per square foot and a total value of $10,358,500.00 given the Property's size of 103,585

square feet.  Lukens rounded the Property's value under the comparable sales approach to

$10,350,000.00.

### iv.    Lukens' Income Capitalization Approach

Lukens' income capitalization valuation, similar to his sales comparison valuation, began

with identifying comparable properties.  Under this approach, however, comparable properties

were properties renting office space.  Lukens identified six properties in Center City Philadelphia

for comparison based on similarity in location, size, and market appeal, in order to derive an

---

[26] The five comparable sale properties Lukens used, each located in Philadelphia, were (i) the Curtis
Building, sold in June 2014; (ii) the Public Ledger Building, sold in June 2015; (iii) One Franklin Plaza,
sold in August 2015; (iv) Penn Mutual Towers/One Washington Square, sold in June 2016; and (v) One
City Plaza, sold in September 2017.  See BNB/UMB Exhibit F, at NMAJH000723.

[27] See BNB/UMB Exhibit F, at NMAJH000734 to 737.

appropriate market rent for the Property.[28]  Based on the market data available, Lukens determined the average rental rate for the Property to be $30 per square foot for its five above-grade levels, and $15 per square foot for its below-grade level.  He then engaged in a three-step process to determine the present value of the future economic benefit of the projected rental income for the Property.  First, he determined the Property's stabilized net operating income after deducting various projected expenses,[29] which he calculated to be $1,846,988.00.  Lukens then applied a direct capitalization analysis by dividing the net operating income by a total overall loaded capitalization rate of 7.9%.[30]  Finally, because repositioning the Property as an office building would require (i) significant expenses, such as construction of additional windows, restrooms, and elevators and upgrading the Museum's existing HVAC system, and (ii) an initial lease-up period in order to achieve stabilized occupancy, Lukens deducted certain estimated capital expenditures of $2,975,000.00 and a lease-up adjustment of $10,250,000.00.[31]

---

[28] The six properties used for Lukens' income capitalization valuation were (i) the Curtis Building; (ii) One Washington Square; (iii) Constitution Place; (iv) The Graham Building; (v) Duane Morris Plaza; and (vi) the Wanamaker Building.  See BNB/UMB Exhibit F, at NMAJH000739 to 740.

[29] Lukens' expert report provides that stabilized net operating income is the income that remains after all operating expenses are deducted from effective gross income, but before mortgage debt service and other non-periodic leasing and capital expenditures.  See BNB/UMB Exhibit F, at NMAJH000747.

[30] The total overall loaded capitalization rate was calculated by adding an overall capitalization rate of 6.5%, which Lukens calculated based on various sources of market data, to a 1.40% tax factor, since an office property owner would be responsible for the tax liability on the Property.  See BNB/UMB Exhibit F, at NMAJH000748 to 749.

[31] Lukens's income capitalization valuation incorporates capital expenditure cost estimates provided by the construction management unit of commercial real estate firm Avison Young.  At the Hearing, the Trustee and A Bondholder objected to the portion of Lukens' appraisal report that included Avison Young's cost estimates, as well as Lukens' testimony regarding the same, on the basis that it constitutes inadmissible hearsay.  Hearing Transcript, 77:12 to 78:17; 80:5 to 80:15; 82:2 to 82:23.  The Court admitted Lukens' expert report into evidence and allowed the testimony and cross-examination of Lukens regarding Avison Young's cost estimates, but expressly did so subject to reserving a ruling on the hearsay objection.  Federal Rule of Evidence 703 provides in relevant part that "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  F.R.E. 703.  The Court is satisfied, based on Lukens' testimony, that the Avison Young cost estimates are the type of data that Rule 703

This three-step analysis resulted in a value of $10,150,000.00 under Lukens' income capitalization approach.

Lukens attributed primary weight to the income capitalization value of $10,150,000.00, rather than the sales comparison valuation of $10,350,000.00.  He did so after consideration of the availability and reliability of the data underlying the approach, as well as the alignment of the approach with how prospective developers, who he viewed as the likely purchaser pool, would value the Property.[32]

### v.    Updates to Lukens' Valuation

Lukens updated his 2019 appraisal of the Property with an August 24, 2020 update focused on the effect of the COVID-19 pandemic on the Property's value.  The update acknowledged the negative impact the pandemic has had on demand for office space in the Philadelphia area, and stated that it "does not bode well for conversion of the [Property] to an alternative highest and best use as an office."[33]  It also noted the recent sale of an additional comparable property in Center City Philadelphia that Lukens concluded, both in the update and at the Hearing, was consistent with the prior appraised value.  Ultimately Lukens' opinion was that the value of the Property is no more than the prior-appraised value of $10,150,000.00.

Lukens did update his opinion of value slightly at the Hearing.  Lukens testified that in calculating the lease-up adjustment in his 2019 appraisal, he failed to account for the difference

---

contemplates.  Lukens testified that it is typical for appraisers to rely on these types of cost estimates when determining capital expenditures, and that he independently reviewed Avison Young's cost estimation report and was satisfied that the figures were reasonable, even if he did not independently verify them.  *In re Morse*, 2018 Bankr. LEXIS 4036, at *19-20 (Bankr. N.D.N.Y. Dec. 20, 2018) (citing Rule 703, finding that in forming his opinion on the market value of a property, expert properly considered and incorporated another expert's inadmissible opinion on cure costs where he independently evaluated them).

[32] See BNB/UMB Exhibit F, at NMAJH000753.

[33] See BNB/UMB Exhibit H, at NMAJH000792.

in rent he attributed to the below-grade level of the Museum building ($15 per square foot)

compared to the rest of the Museum building ($30 per square foot).  That error resulted in an

overstatement of lost rent in the amount of $350,000.00, which would reduce the lease-up

adjustment to $9,900,000.00.  As such, Mr. Lukens testified that under his income capitalization

model, the correct value is $10,500,000.00.

### vi.      Lukens' Testimony on the Cost Approach

Although Lukens did not perform a cost approach valuation, he did testify regarding what

he saw as the problems with estimating the Property's market value based on that approach.

Lukens testified that even if the Museum building cost the Debtor approximately $83,000,000 to

build ten years ago, it is a special purpose property that was built to the Debtor's specifications,

which were expensive.  Therefore, no entity would pay the replacement cost of those

specifications, because purchasers of special purpose properties do not value those properties in

the same way as the original developer.  As such, there is a depreciation that results simply by

virtue of the creation of a special purpose property with special purpose improvements.

Lukens also testified that because he understands USPAP to require analysis of market

data to conduct a depreciation analysis, and because USPAP governs appraisals in Pennsylvania,

an appraiser in Pennsylvania cannot rely on a cost manual like the Marshall and Swift Valuation

Service's as a substitute for market-derived information.  Therefore because special purpose

properties like the Property here have limited or no markets for sale, Lukens viewed it as very

difficult to determine a defensible depreciation figure to input into a cost approach valuation.[34]

Lukens testified that while he has performed cost approach valuations with respect to special

---

[34] Lukens did, however, acknowledge that Enloe's report, discussed below, identified three sales of
purpose built-museums that might theoretically be used to extract depreciation.  Hearing Transcript,
211:10 to 212:5.

purpose properties in the past, he has done so only when he had the ability to extract depreciation

from market sales data, and with one exception, has not primarily or exclusively relied on the

cost approach.  He further testified that, regardless of USPAP's requirements, he believed the

lack of market data from which to extract depreciation rendered the cost approach less reliable

and easier to manipulate.

### b.    Dean Adler ("Adler")

Adler is a real estate investor and Chief Executive Officer at the firm of Lubert-Adler

Partners L.P., which specializes in investing equity capital to buy and renovate commercial and

residential properties.  He has nearly 40 years of experience investing in real estate, with a

particular focus in the Philadelphia market.  At the Hearing Adler was qualified as an expert in

commercial real estate and his expert report was admitted into evidence.[35]

### i.    Adler's View of the Property Within the Philadelphia Commercial Real Estate Market

Adler testified that there are three major areas in Philadelphia for leased office space and

a fourth, less attractive one.  The Property is located in the less attractive area near Independence

Mall, where buildings obtain lower rents, have higher vacancies, and generally is less desirable

for office tenants, instead attracting government offices.  Adler testified that, as an investor, he

generally looks for opportunities in the areas in Philadelphia where there is more demand.

Notwithstanding its location in a less desirable commercial area, Adler testified that his

firm looked at the Property "two years ago" to determine whether it had a higher and better use

---

[35] Adler previously served on the Debtor's Board of Trustees, and his wife is currently a Trustee.  Adler has also made sizable contributions to the Debtor in the past.  At the Hearing, the Trustee and the A Bondholder questioned Adler on these connections to the Debtor.  After considering Adler's testimony, however, the Court is satisfied that Adler was credible and truthful regarding his opinion of Philadelphia's commercial real estate market and the Property's value to an investor, notwithstanding any prior connection to the Debtor.

than as a single tenant building. His firm looked at increasing the Property's value either by expansion on the roof of the Museum building or use as a multi-tenant office building, but ultimately determined that roof expansion was not structurally possible and conversion to a multi-tenant office building was not economically feasible. The firm also evaluated the Property's potential as a retail property but similarly concluded it was not a suitable use given the Property's location.

### ii.     Adler's Opinion of the Property's Value to Investors

In light of the locational handicaps the Property faces, Adler believes its highest and best use is as a multi-tenant office space because the alternatives are so poor. His opinion, which was based on the pre-COVID Philadelphia commercial leasing market, was that the Property could obtain rent of $27.50 per square foot. This estimate was limited to the above-grade levels of the Museum building, which total approximately 80,000 square feet, because Adler did not believe much of a market exists for leasing windowless below-grade space. Adler deducted an estimated $12.50 per square foot in expenses, resulting in Adler's projected net rent of $15.00 per square foot. That net rent was then multiplied by what Adler believed was the Museum building's leasable space of 80,000 square feet, resulting in net revenue of $1,200,000 to $1,300,000.[36]

Adler testified how he, as a professional real estate investor, would value the Property in light of this projected net revenue. Adler would require a higher rate of return on an empty building, like the Property, that is being leased as an office building in order to reflect the increased risk. Adler testified that he would need a 9% return on the Property. Based on the projected net rental revenue of $1,200,000 and 9% rate of return, Adler estimated that his

---

[36] Adler provided a range based on a small allowance for revenue that could be obtained for the building's below-grade level.

targeted value for the Property would be $14,000,000 to $15,000,000 "all in." He clarified, however, that this targeted value does not reflect that it will generally cost $100 per square foot to prepare the Property for tenants.[37] Nor does it account for the cost of unique modifications that would be required of the Museum building to convert it to a multi-tenant office building. Adler calculated that for 80,000 square feet of leased space at $100 per square foot, this additional cost of $8,000,000 would reduce the amount he would be willing to pay for the Property to $6,000,000 in order to achieve his required 9% return. Adler testified that he believed the appraisal of Lukens, as well as the appraisals of the experts retained by the Trustee and the A Bondholder, were too high.

Adler also made clear that his opinion on the Property's value as a conversion to office space was formulated prior to the onset of the COVID-19 pandemic. According to Adler that changed circumstance has exacerbated the oversupply in commercial office space in the Philadelphia market, which was already suffering from a high vacancy rate, with an expected decrease in rents to be obtained.

Adler testified that in reaching his conclusion on the value of the Property he did consider its value as a museum but came to the conclusion that it had "very minimal value" as such. This opinion was based on the lack of a market of museums looking for space to lease and existing museums' struggles in their current leased spaces. Adler testified that he was not aware of any existing museum that would lease the Property, and therefore presumed that its value would be

---

[37] Adler testified that the $100 per square foot figure is based on three factors: (i) a market rate of $60 per square foot for tenant allowance; (ii) estimated leasing commissions to be paid to brokers of $20 per square foot; and (iii) sharing costs paid while leasing up the building, such as debt service, taxes, and insurance.

lower as a museum than as an office space.  Adler confirmed, however, that he had not

developed a formal opinion of the value of the Property as a museum.

Adler testified that as a professional investor, in evaluating whether and how much to

offer for a building, it would be "totally irrelevant" to him how much the current owner of the

property spent to build the property.  Rather, he evaluates a property's value prospectively, i.e.,

what it is worth to him going forward given its highest and best use.

### c.      Phillip Balderston ("Balderston")

Balderston is a real estate investor and developer who owns Odin Properties ("Odin"), a

real estate investment firm that acquires investment properties, currently in various locations.

Odin primarily invests in multi-family projects, but approximately 20% of its portfolio has been

office and retail properties.  Balderston testified at the Hearing regarding the current state of the

commercial real estate market in Philadelphia.  At the Hearing Balderston was qualified as an

expert in commercial real estate and his expert report was admitted into evidence.[38]

Balderston testified that the COVID-19 pandemic and civil unrest during the summer of

2020 have negatively impacted the Philadelphia commercial real estate market.  Balderston

testified that, based on his conversations with market participants, it is his opinion that both

forces have contributed to a decline in commercial real estate values.  Like Adler, Balderston

opined that these forces have led to an oversupply of office space and a resultant decrease in

---

[38] Like Adler, Balderston has a connection to the Debtor outside of the present matter.  He serves as a
member of the Board of Trustees and has contributed a significant amount to the Debtor.  However,
Balderston testified that he has no financial stake in the outcome of the valuation dispute and his
relationship with the Debtor had no impact on his testimony regarding the commercial real estate market.
As with Adler, after consideration of Balderston's testimony the Court is satisfied that he was credible
and truthful in his testimony regarding the current state of Philadelphia's commercial real estate market,
notwithstanding his connection to the Debtor.

rents.  Balderston felt that the reduced demand in Center City Philadelphia office space

stemming from employers' work-from-home policies would outlast the COVID-19 pandemic.

> ## 2.    The Trustee's and A Bondholder's Expert Opinions on the Property's Value

> ### a.    David C. Lyon ("Lyon")

Lyon is the Executive Vice President and a partner of Metropolitan Valuation Services.

He has 22 years of experience as an appraiser and has appraised over 100 special purpose

properties, which be believed include nine museums.[39]  At the Hearing he was qualified as an

expert in real estate appraisal and a redacted version of his expert report, excluding his opinion

as to the value of the Property, was admitted into evidence.

Lyon appraised the Property in 2015 using the cost approach to valuation.  Lyon's

appraisal report, which was prepared well before the present valuation dispute arose, concluded

that the cost approach was appropriate given the Property's specialty use as the Museum.  Lyon

testified that he determined the cost approach was the appropriate methodology to use for the

Property based on it being a special purpose property for which there is a limited sales market

and an extremely limited or nonexistent leasing market, which would render the sales

comparison approach and the income capitalization approach less credible or not possible.  Lyon

testified that his use of the cost approach to value the Property was consistent with its general use

in appraisal practice for recently constructed special purpose properties, his own practice in

appraising special purpose properties, and his prior appraisals of museums.  He further opined

that it would be atypical for an appraiser to not rely on the cost approach to value a special

purpose property, given the limited sales and leasing markets, and he had never failed to at least

---

[39] Lyon characterized a special purpose property as a property which has a unique physical design that is generally built for a specific purpose or specific use.  Hearing Transcript, 461:18 to 461:22.

include a cost approach in his own valuations.  He therefore believed it is appropriate to value the Property relying primarily or exclusively on the cost approach.

With respect to calculating depreciation for purposes of the cost approach valuation, Lyon testified that there are three methods generally used to extract depreciation: the market extraction method, the economic age-life method, and the breakdown method.[40]  According to Lyon the market extraction method, which uses recent comparable sales of properties, is likely the most instructive.  Lyon testified, however, not only that the absence of recent sales from which depreciation can be extracted does not preclude an appraiser from extracting depreciation by another method, but also that in appraising special purpose properties he has used a method other than market extraction "nearly all the time."  Where there are no recent sales from which to extract depreciation, the economic age-life model is generally applied by most appraisers.  This method estimates the effective age of the property by dividing its actual age by the remaining economic life for like-kind properties.  Lyon testified that he uses the Marshall and Swift Valuation Service to guide his calculation of a property's total economic life.

Lyon testified that there are three types of depreciation or obsolescence: physical, functional, and external.  Lyon described physical obsolescence as depreciation of the physical utility of property, giving as an example the depreciation of an HVAC system with a 10-year-old compressor.  Lyon described functional obsolescence as a measure of the utility of the property in relation to its business or use.  Lyon characterized external obsolescence as external factors that affect the property, such as natural disasters or the COVID-19 pandemic.  Lyon explained that the depreciation estimate is not an exercise aimed at establishing the market value of a

---

[40] While Lyons gave direct explanations of the market extraction and economic age-life methods, he did not do so with respect to the breakdown method.  Nor does the Court's review of Lyons' expert report reveal a discussion or explanation of the breakdown method of depreciation analysis.

building, but rather is an estimate of the contributory value of a building to the underlying land, which generally does not depreciate.  In this way the cost approach is designed to capture the replacement value of the building, in this case the Museum building, by estimating the current cost to construct a reproduction of or replacement for the existing structure.

### b.    Michael Silverman ("Silverman")

Silverman is a licensed real estate appraiser and is an Executive Vice President at Newmark Knight Frank.  He has been appraising real estate since 1993 and has been involved in over 3,000 appraisals over the past five years.  At the Hearing, Silverman was qualified as an expert in real estate appraisal and his expert report was admitted into evidence.

Silverman appraised the Property twice on behalf of the A Bondholder, the first time in February 2018 and the second time in June 2019.  Neither was done in contemplation of the present valuation dispute, although the June 2019 appraisal was subsequently updated in August 2020.

### i.    Silverman's 2018 and 2019 Appraisals of the Property

Silverman's 2018 appraisal was done with an instruction from the A Bondholder to value the Property to reflect an alternate use, rather than continuation as a museum.  Silverman therefore appraised the Property as a corporate headquarters office facility, which he determined was its highest and best use.  He determined that its market value was $29,900,000.00, based on a reconciliation of his valuations under each of the three valuation approaches.  Silverman testified, however, that had he not been given the instruction to value the Property with an alternate use, he would have valued the museum as a museum because it is a unique special use

property that was built and to be utilized as a museum, and would have employed the cost

approach to do so because that approach is most applicable to special use properties.[41]

Silverman testified that his 2019 appraisal of the Property was done with the same

marching orders from the A Bondholder, i.e., to update the 2018 appraisal using the same

methodology employed for the 2018 appraisal.  The 2019 appraisal again concluded that the

Property was best suited for conversion to a Class A single tenant corporate headquarters, and

Silverman employed the sales comparison approach and the income capitalization approach to

value it as such.  Silverman determined that the Property's market value under this highest and

best use assumption was $29,150,000.00.  As with the 2018 appraisal, however, Silverman

testified that had he not been instructed to value the Property with an alternate use, he would

have valued the Property as a museum using and relying primarily on the cost approach.

### a.    Silverman's Sales Comparison Approach

In conducting his sales comparison valuation in 2019, Silverman first identified what he

believed were six comparable properties.[42]  Silverman explained that ideally comparable

properties are selected within the same market area as the subject property and offer similar rent

potential, similar size, and have other similar attributes.  However Silverman felt that there were

inadequate comparable sales in Center City Philadelphia to use in his analysis because the sales

---

[41] Silverman testified that because the A Bondholder wanted an insurable value for the Property and
wanted him to provide a land value in connection with the 2018 appraisal, both of which are components
of the cost approach, he did elect to do a cost approach valuation, but based on the Property's adaptive
reuse as an office building rather than as a museum.  However, he was not providing an insurable value in
connection with the 2019 appraisal, and therefore deemed it unnecessary to employ the cost approach.
Hearing Transcript, 637:17 to 638:11.

[42] The six properties Silverman selected for his sales comparison approach, each of which sold between
April 2016 and December 2018, were: (i) Millenium I, II and III, Conshohocken, Pennsylvania; (ii) Eight
Tower Bridge, Conshohocken, Pennsylvania; (iii) CHOP Science Center, Philadelphia, Pennsylvania; (iv)
University Place 2.0, Philadelphia, Pennsylvania; (v) 20 Moores Road, Malvern, Pennsylvania; and (vi)
Five Tower Bridge, West Conshohocken, Pennsylvania.  See Debtor's Exhibit C, at BNB00017735.

he was aware of were either of properties much larger than the Debtor's Property or reflected major post-sale repositioning costs that would not be required of a purchaser of the Debtor's Property.  Silverman therefore expanded his search to sales of properties outside of Philadelphia that offered the same Class A appeal, similar size, and similar appeal to an institutional investor as the Property.

After identifying comparable properties, Silverman then made upward and downward adjustments to those properties' sale prices based on differences between them and the Property such as location, demand generators, logistics, and other factors.  Those adjustments resulted in adjusted sale prices that ranged from $280.26 to $455.00 per square foot.[43]  Silverman reconciled this range to a value of $375.00 per square foot for the comparable sales, which he then applied the Property's square footage of 103,585 to derive a value for the Property of $38,844,375.00.  That value, however, assumed that the Property was stabilized, because each of the comparable properties were stabilized at the time of their sales, such that their sale prices reflected that.  Silverman therefore deducted a stabilization discount of $8,770,000.00, consisting of (i) additional lease-up costs Silverman expected a purchaser would incur while getting a tenant in place at the Property in the form of lost rental income, utilities, tenant improvement costs, and leasing commission, and (ii) additional profit a purchaser would require to offset its risk during the lease-up process.  Deducting the stabilization discount resulted in a value for the Property under Silverman's sales comparison approach of $30,100,000.00.

---

[43] Silverman mistakenly testified at the Hearing that this range was $208.26 to $455.08 per square foot. Hearing Transcript, 642:24 to 643:2.

### b.      Silverman's Income Capitalization Approach

Silverman also employed the income capitalization approach to value the Property in 2019.  He again began by identifying comparable properties that would appeal to the type of corporate tenant he believed would be most drawn to lease the Property, based on location, physical characteristics and other factors.[44]  He then made upward and downward adjustments to the base rents for each of those comparable properties to account for differences from the Property in location, age, building quality, and similar considerations.  Those adjustments resulted in a range of rent values for the comparable properties from $31.95 to $38.12, which Silverman averaged to an indicated rent for the Property of $35.00 per square foot.  Again, applying that figure to the Property's 103,585square feet of leaseable space, Silverman calculated annual gross rental income for the Property of $3,625,475.00.

Silverman deducted from the gross rental income of $3,625,475.00 various projected operating expenses for the Property, such as taxes, insurance, and maintenance costs, to arrive at net operating income of $2,402,991.00.  Silverman then divided that net operating income by a capitalization rate of 6.5%, which he calculated based on indicative rates he surveyed from comparable sales, investor surveys, and mortgage and equity investment assumptions.  This resulted in a stabilized value for the Property that Silverman rounded to $37,000,000.00.  Silverman then deducted from that value the same anticipated lease-up costs he calculated in connection with his sales comparison approach, in the amount of $8,770,000.00, to derive an as-is value of $28,200,000.00 under his income capitalization analysis.

---

[44] The six properties Silverman identified for his income capitalization approach, each located in Philadelphia, were: (i) BNY Mellon Center, 1735 Market Street; (ii) The Stein Building, 1624-28 Locust Street; (iii) 1100 Ludlow Street; (iv) 2400 Market Street (lease #1); (v) 2400 Market Street (lease #2); and (vi) 1700 Market Street.  Silverman testified that it was easier to find comparable properties in Center City Philadelphia for the income capitalization approach than it was for the sales comparison approach. Hearing Transcript, 646:11 to 646:16.

### c.    Silverman's Reconciliation of the Two Approaches

Silverman reconciled the values indicated by his sales comparison analysis, of $30,100,000.00, and his income capitalization approach of $28,200,000.00, by averaging the two figures. Silverman testified that he did so because he believed the data supporting each of the value indications was good and felt that they were both reasonable approaches to determine value. Silverman therefore reached a market value conclusion for the Property of $29,150,000.00.

### ii.    Silverman's 2020 Update to the 2019 Appraisal

In August 2020, after the present dispute over the Property's value had arisen, Silverman updated his 2019 appraisal of the Property at the request of the A Bondholder. Silverman's update was performed with consideration of "discussions with market participants reflecting general office market conditions within the City of Philadelphia, analysis of sale transactions since the prior report, as well as recognizing the potential impact on the marketability for office properties due to the prevailing novel coronavirus/COVID-19."[45]

Silverman testified that he could not verify any appropriate sales since the 2019 appraisal to consider. He believed that office rental rates in Philadelphia had held steady since the 2019 appraisal, but considered the effect of the longer absorption period, higher tenant improvement costs, and shortened lease terms on the Property's value. Based on those factors, which resulted in increased lease-up costs of approximately $2,900,000.00, Silverman concluded that the market value of the Property had declined 10% from the 2019 appraised value, resulting in a revised market value of $26,200,000.00. Silverman testified that, although his 2020 update did not

---

[45] See BNB/UMB Exhibit D.

consider any sales beyond those included in the 2019 appraisal, he still considered the properties included in the 2019 appraisal to be applicable and the most valid sales on which to base his updated value conclusion.

### iii.    Silverman's Testimony on the Cost Approach

Although Silverman did not perform a cost approach in connection with his valuation, he did testify at the Hearing about that approach generally.  Silverman testified that the cost approach seeks to value a property by determining the land value plus the cost to rebuild the improvements, and then subtracting the depreciation of those improvements.  With respect to the replacement or rebuilding costs, one method of calculating them is by referencing the actual construction costs, if current.  One can also use the Marshall Valuation Service to determine construction costs.  With respect to physical depreciation, an appraiser can look to sale transactions in the marketplace, but if those are lacking, the appraiser can calculate depreciation by the age-life method.  That method divides the effective age of a property by its estimated total economic life.  Silverman testified that in his experience the cost approach is the primary method to value special purpose properties because of the lack of market data to conduct a sales comparison approach.

### c.    Eric L. Enloe ("Enloe")

Enloe is a real estate appraiser and serves as a Managing Director in the appraisal group of Jones Lang LaSalle ("JLL").  He has been appraising real estate for 22 years and has been involved in approximately 5,000 valuations across the United States.  Although based in Chicago, Illinois, Enloe testified that he has regularly performed real estate appraisals of properties in the Philadelphia market.  At the Hearing Enloe was qualified as an expert in real estate appraisal and his appraisal report was admitted into evidence.

Enloe performed a value-in-use appraisal of the Property in August 2020, after the instant

valuation dispute arose.[46]  Enloe's appraisal report, citing The Dictionary of Real Estate

Appraisal published by the Appraisal Institute, defines value-in-use as "The value of a property

assuming a specific use, which may or may not be equal to market value but is different

conceptually." [47]  Enloe explained at the Hearing that his value-in-use appraisal is premised on

continued use of the Property as a museum, which he understood is the Debtor's intention.

Enloe concluded, based on that methodological assumption, that the value of the Property is

$66,000,000.00.  That value was the product of Enloe applying both the sales comparison

approach and the cost approach to value the Property.[48]

### i.   Enloe's Sales Comparison Approach

With respect to the sales comparison approach, Enloe did a national search for

comparable museum sales.  Enloe identified four comparable museum sales.[49]  However, three

of those properties were sold for an alternative use, and the fourth was not an arms-length

transfer.  Given the value-in-use methodology under which he was valuing the Property, Enloe

---

[46] Enloe testified at the Hearing that, in addition to the appraisal he performed as part of JLL's appraisal group, he believed that the real estate brokerage arm of JLL also performed an appraisal of the Property under an expedited sale basis.  Hearing Transcript, 713:10 to 714:8.  Enloe testified, however, that the real estate brokerage group is completely separate from his group, with neither group having access to the other's work files or information.  *Id.*, 714:9 to 714:17.  Enloe stated that he did not know what conclusions the brokerage group may have reached regarding the Property's value.  *Id.*, 714:18 to 714:22.

[47] See Debtor Exhibit D at BNB0017952.

[48] Enloe's report states that because the Property is a special purpose property for which there is limited similar market data on which to base an income capitalization approach, that approach was deemed inapplicable.  See *Id.* at BNB0017962.

[49] The museum sales Enloe identified were: (i) the Pope John Paul II Cultural Center in Washington D.C. (sold in 2011); (ii) the Museum of Confederacy in Richmond, Virginia (sold in 2017); (iii) the Orange County Museum of Art in Newport Beach, California (sold in 2018); and (iv) the Newseum in Washington, D.C. (sold in 2020).  See Debtor Exhibit D, at BNB0018022.

concluded that the results of the sales comparison approach were inconclusive because the comparable sales yielded insufficient data on which to calculate a value for the Property.

### ii.       Enloe's Cost Approach

Enloe testified that, given the inconclusive results of the sales comparison approach, he relied on the cost approach to value the Property.  He testified that the Property is a special purpose property because museums fall within a unique category of properties that are difficult to convert to other uses and do not have many market transactions.[50]  These special purpose properties, Enloe said, are typically appraised by application of the cost approach.[51]

Enloe's appraisal report sets forth the process for valuation of a property under the cost approach, which the report states is "based on the principle of substitution – that a prudent person would pay no more for a property than the cost to construct a similar and competitive property, assuming no undue delay in the process."[52]  The steps in the process are: (1) estimate the land value according to its highest and best use; (2) estimate the replacement cost of the building and site improvements; (3) estimate the physical, functional and/or external depreciation accrued to the improvements; and (4) sum the depreciated value of the improvements with the value of the land for an indication of value.[53]

---

[50] Enloe defined a special purpose property as "a property that is unique, typically has limited marketability.  It is designed in a specific way that makes it hard to convert to an alternative use.  It's typically a property that falls outside of the … core four property types, being office, retail, industrial, and multi-family."  Hearing Transcript, 718:17 to 718:25.

[51] Enloe testified that he had previously performed between 100 and 200 appraisals of special purpose properties and believed he had relied primarily or solely on the cost approach approximately 80% of the time.  Hearing Transcript, 722:11 to 723:6.  He further testified that of the five museums he had previously appraised, all had been appraised relying primarily on the cost approach.  Hearing Transcript, 722:5 to 722:10.

[52] Debtor Exhibit D, at BNB0018017.

[53] *Id.*

Enloe calculated the Property's land value by a sales comparison approach, using land he felt was similar to the Property in terms of location, size, and zoning.[54]  Enloe made adjustments to those comparable properties' sale prices based on size and location, resulting in adjusted unit values ranging from $381.50 to $478.29 per square foot.  Enloe reconciled this range to a unit value of $440.00, then multiplied it by the square footage of the Property's underlying land of 22,034, resulting in a land value rounded to $9,700,000.00.

Having valued the land, Enloe then calculated the as-new replacement cost of the Museum building and site improvements.[55]  Enloe used several sources to estimate the direct replacement cost of the Museum building and improvements.  First, he consulted the Marshall & Swift Valuation Service, a nationally recognized source of cost data commonly used in the valuation profession, to determine cost estimates for construction.  Using those estimates, Enloe calculated total direct costs were $38,157,779.00, or $368.37 per square foot.  Enloe also analyzed construction costs of the Spy Museum in Washington D.C., which JLL had previously valued and therefore had first-hand information on costs.  Enloe calculated the direct costs to build that museum were $75,784,000.00, or $680.90 per square foot.[56]  Finally, Enloe used a

---

[54] The locations of the four properties Enloe used for his sales comparison, each in Philadelphia, were: (i) 427-443 N. Broad Street; (ii) 510 N. Broad Street; (iii) 545 N. Broad Street; and (iv) 4233 Chestnut Street.  See Debtor Exhibit D, at BNB0018011.

[55] Enloe's report describes replacement cost as "the current cost to construct improvements with equivalent utility to the subject, using modern materials and current standards, design, and layout.  Estimates of replacement cost for the purpose of developing a market value opinion include three components: direct costs, indirect costs (also known as soft costs) and entrepreneurial profit."  See Debtor Exhibit D, at BNB0018017.

[56] At the Hearing, Enloe testified that the square footage figure of 111,300 he used to calculate the Spy Museum's cost per square foot came were taken from documents JLL received when conducting its appraisal of that museum.  Counsel for the Debtor asked Enloe if he was aware that the Spy Museum's website claimed that it was 140,000 square feet, which Enloe was not but reasoned that it could be attributable to "a difference in the kind of usable area versus some storage or basement space that wasn't considered functional."  Enloe agreed, however, that if the square footage was adjusted up to 140,000, the cost per square foot would decrease.  Hearing Transcript, 744:1 to 745:2.  Notwithstanding counsel's representation, the Court was not presented with evidence of the Spy Museum's square footage other than

28

direct cost estimate by reviewing the construction budget of the developer that built the

Museum.[57]  That budget reflected that the developer's costs were $94,730,841.00, or $914.52 per

square foot.  Enloe then reconciled the three direct cost estimates he obtained to arrive at a figure

of $62,151,000, or $600.00 per square foot.[58]  Enloe testified that this reconciliation is not a

mathematical average of the three cost estimates, but rather reflects what he believes is the cost

for which a museum could be built that would have the same utility that the Museum currently

does.

Enloe next analyzed depreciation to be deducted from the replacement cost. As set forth

in his report, there are three types of depreciation: physical deterioration, functional

obsolescence, and external obsolescence.[59]  Enloe's report characterizes functional obsolescence

as a loss in value due to changes in market tastes or standards, while external obsolescence is due

to circumstances outside the property itself, such as industry, demographic, or economic

conditions.[60]  Enloe estimated physical depreciation and functional obsolescence by using the

economic age-life method, dividing what he determined to be the effective age of the Property of

six years by its economic life as determined by reference to the Marshall Valuation Service.

Considering those factors, Enloe determined that depreciation of 9.4% should be deducted from

---

the number in Enloe's report.  Moreover, counsel for the A Bondholder represented at the Hearing that
the figure in Enloe's report came from the architect of the Spy Museum.  Hearing Transcript, 756:7 to
756:15. The Court therefore was presented only with conflicting representations of counsel, and not
evidence, regarding whether Enloe's use of the square footage figure stated in his report was erroneous.

[57] Enloe's report states that the budget was provided to JLL by "the client" who obtained it from an
appraisal by another firm.  See Debtor Exhibit D, at BNB0018019.  At the Hearing Enloe testified both
that the Debtor was the source of the budget but that it was provided to him by the Trustee's counsel.
Hearing Transcript, 745:3 to 746:12.

[58] Enloe did not apply an entrepreneurial profit metric to the replacement cost estimate because the Debtor
is a non-profit institution.  See Debtor Exhibit D, at BNB0018020.

[59] See Debtor Exhibit D, at BNB0018020.

[60] Id. at BNB0018020 to 001802021.

the as-new replacement cost.  Applying that deduction, Enloe subtracted $5,855,408.00, resulting

in a total depreciated replacement cost of $56,295,592.00.  Enloe did not believe a deduction for

external obsolescence was required for the Property "given our value in use premise."[61]

Enloe's final step in his cost approach valuation was to add the land value of

$9,700,000.00 to the depreciated replacement cost of $65,995,592.00.  That resulted in a final as-

is value of $65,995,592.00, which Enloe rounded to $66,000,000.00.  Because Enloe did not

apply the income capitalization approach and determined that the sales comparison approach was

inconclusive, his reconciled value of the Property was the cost approach value of

$66,000,000.00.

### 3.    The Fact Witnesses' Testimony on Value

#### a.    Stuart Fliegelman ("Fliegelman")

Fliegelman is the Vice President of BNB Bank (the A Bondholder).  Fliegelman is a loan

workout officer in connection with the Debtor's debt to the A Bondholder and reported on the

value of the Property from time to time.  In June 2020 the A Bondholder, for internal purposes,

valued the Property at $19,750,00.00 based on a broker price opinion it obtained from JLL.  The

JLL opinion was that the value would be higher if the Property were sold to a "user" rather than

an investor.  Fliegelman testified that the valuation was prepared because once the Debtor

defaulted on its obligations and the debt became a nonperforming asset, accounting principles

were triggered that required the bank to value the collateral.  The value reflected the amount the

bank believed the Property would garner in a sale.  Fliegelman clarified that this was the

projected amount if the Property had to be marketed and sold immediately in a "fire sale."

---

[61] *Id.* at BNB0018020.

Fliegelman testified that the JLL broker opinion varied from an appraisal, which would be more

detailed, provide comparable sales, and make adjustments to value.

Fliegelman also testified that, in connection with his responsibilities to report internally

on the value of the Property, he drafted a June 30, 2020 memorandum titled "Charge Off

Recommendation" that referenced Lukens' appraised value of $10,150,000.00 and Silverman's

2019 appraised value of $29,900,000.00, and concluded that the value would be closer to

somewhere in the middle.  Fliegelman testified that the memorandum was prepared in draft form

and was not approved or submitted for discussion or evaluation as to the charge off the bank

might take.  Fliegelman also noted that a charge off does not necessarily reflect an opinion of the

collateral itself, but could be based on additional factors such as costs or risks associated with

managing the property, marketing, and carrying costs prior to closing a sale transaction.

### b.      Paul Waimberg ("Waimberg")

Waimberg is the Chief Financial Officer of the Debtor.  Waimberg's testimony centered

on the value of the Debtor's property as reflected in its financial statements and the insured value

of the Debtor's property.  Waimberg testified that, as permitted under Generally Accepted

Accounting Principles, the Debtor's assets are valued at historical cost less depreciation in its

financial statements.  This value is not intended to report the fair market value of the assets,

Waimberg testified, and the book value does not equate to market value or fair market value.

Waimberg testified that the actual cost to acquire the land at the Property was

$9,500,000.00, but that the cost reflected in the Debtor's financial statements of $11,354,000.00

reflects additional costs associated with acquiring it which are permitted to be capitalized under

GAAP.  With respect to the $95,000,000.00 insurance coverage the Debtor carries, Waimberg

testified that it covers the building and its contents, which are insured on a replacement cost

basis, not on a market value basis.  Waimberg testified that the level of insurance is not the

market value of the assets.[62]

## III.    DISCUSSION

### A.    The Shifting Burden of Proof Applicable to the Valuation Motion

Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") allocate the burden of proof as to the value of secured claims under

§506(a).  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012).  In *Heritage Highgate*,

however, the Third Circuit held that a burden-shifting framework controls valuations of

collateral to decide the extent to which claims are secured pursuant to §506(a).  *Id.*  Under that

framework, the initial burden is on the Debtor as the party challenging the value of the

Bondholders' secured claims, because §502(a) of the Bankruptcy Code and Rule 3001(f) of the

Bankruptcy Rules grant *prima facie* effect to the validity and amount of a properly-filed claim.

*Id.* at 140 (*citing In re Williams*, 381 B.R. 742, 744 (Bankr. W.D. Ark. 2008)).  The *Heritage*

*Highgate* court articulated how, if that initial burden is satisfied, the burden of persuasion will

then shift to the Trustee and the A Bondholder: "If the movant establishes with sufficient

evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of

insufficient value, the burden shifts.  The creditor thereafter bears 'the ultimate burden of

persuasion … to demonstrate by a preponderance of the evidence both the extent of its lien and

---

[62] The Court stops here to note that, although it found both Fliegelman and Waimberg to be credible and truthful, their testimony did not assist the Court in determining the value of the Property.  Fliegelman testified as to the value the A Bondholder internally ascribed to the Property for purposes of selling it in a quick sale or charging off a portion of the Debtor's debt to the bank.  Waimberg testified as to how the Debtor accounts for the Property as a matter of accounting and the value for which it insures the Property and the Museum contents.  Neither witness's testimony goes to the replacement value of the Property, which is the value the Court is tasked with determining.

the value of the collateral securing its claim.'" *Id.* (quoting *In re Robertson*, 135 B.R. 350, 352

(Bankr. E.D. Ark. 1992)).

The burden of proof framework articulated in *Heritage Highgate* means the Debtor bore

the initial burden of producing evidence to overcome the *prima facie* validity of the Trustee's

secured claim with respect to the Property.  Only if the Debtor met that burden were the Trustee

and the A Bondholder required to demonstrate that the Property's value is sufficient to secure the

Trustee's claim.

**B.      The Applicable Standard for Valuation Under §506(a) is Replacement Value
        Where the Debtor Proposes to Retain the Collateral**

Section 506(a) of the Bankruptcy Code provides, in relevant part to the instant dispute, as

follows:

> An allowed claim of a creditor secured by a lien on property in which the estate
> has an interest … is a secured claim to the extent of the value of such creditor's
> interest in the estate's interest in such property … and is an unsecured claim to the
> extent that the value of such creditor's interest … is less than the amount of such
> allowed claim.  Such value shall be determined in light of the purpose of the
> valuation and of the proposed disposition or use of such property . . . .

11 U.S.C. §506(a)(1).

This Court is bound by clear precedent from the Supreme Court and the Third Circuit

holding that value of a property being retained by a debtor is measured under §506(a)(1) by the

collateral's replacement value.  In *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962, 117

S. Ct. 1879, 1885, 138 L. Ed. 2d 148, 158 (1997), the Supreme Court held, in the context of a

chapter 13 plan's cramdown of a secured creditor under §1325(a)(5)(B) of the Bankruptcy Code,

that the value of collateral being retained under the plan should be measured by replacement

value, rather than a foreclosure value standard.  520 U.S. at 963.  The debtor in *Rash* had urged

the court to value their truck, which they intended to retain and use under their plan, based on the

net amount their secured creditor would realize upon foreclosure and sale.  *Id.* at 957.  The

secured creditor argued that the truck should be valued according to what the debtors would need

to pay to purchase a like vehicle. *Id.* Analyzing the language of §506(a), the court concluded

that in a cram down case where the debtor is proposing to retain a secured creditor's collateral,

"the value of the property (and thus the amount of the secured claim under §506(a) is the price a

willing buyer in the debtor's trade, business, or situation would pay *to obtain like propert*y from

a willing seller." *Id.* at 960 (emphasis added). The court went on to reason that §506(a)'s dictate

that value be determined in light of the collateral's proposed disposition or use was of

"paramount importance" in determining its value, and that replacement value accurately

accounted for the debtor's use of the property: "It values 'the creditor's interest in the collateral

in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for

the debtor derived from the collateral equal to … its [replacement] value.'" *Id.* at 962-63

(*quoting In re Winthrop Old Farm Nurseries*, 50 F.3d 72, 75 (1st Cir. 1995)). The *Rash* debtors

intended to retain and use their truck to generate income, and therefore "[t]hat actual use, rather

than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to

the property's disposition or use." *Id.* at 963. Importantly, the Supreme Court made clear that

by pinning §506(a)'s valuation standard to replacement value, it was equating that concept to fair

market value, *i.e.*, the price a willing buyer in the debtor's trade, business, or situation would pay

a willing seller to obtain property of like age and condition. *Id.* at 959 n.2.[63]

Fifteen years later, relying heavily on the analysis the Supreme Court employed in *Rash,*

the Third Circuit in *Heritage Highgate* affirmed the bankruptcy court's determination that the

---

[63] The *Rash* court "expressly left 'to bankruptcy courts, as triers of fact, identification of the best way of
ascertaining replacement value on the basis of the evidence presented.'" 520 U.S. at 965 n.6; *see also In
re Body Transit, Inc.*, 619 B.R. 816, 828 (Bankr. E.D. Pa. 2020) ("Case law on [§506(a)] emphasizes the
discretion granted the bankruptcy court to choose an appropriate valuation methodology as contested
matters arise during the course of a bankruptcy case.").

debtor's residential subdivision development was to be valued according to its fair market value as of the date of plan confirmation, rather than according to the income the debtor might realize in the future as additional lots were sold, 679 F.3d at 146. The valuation dispute arose on a motion to value to the property under §506(a). *Id.* at 137. The debtor's secured creditor argued that because the debtor's "proposed disposition or use" of the property was to continue developing it and selling additional lots after its plan was confirmed, valuation under §506(a) required consideration of the additional income the property would generate in the future. *Id.* at 139. The *Heritage Highgate* court observed that the statute's text was central to resolution of the appropriate valuation standard to be applied. *Id.* at 140. Recognizing that the statute does not specify the appropriate valuation standard, the court looked to the section's legislative history in stating that a flexible approach was envisioned, allowing bankruptcy courts to determine the valuation standard that should be applied under the circumstances of a particular case. *Id.* at 141. The court noted, however, that in bestowing this flexibility, Congress made clear that "'the proposed disposition or use of the collateral is of paramount importance to the valuation question.'" *Id.* (quoting. *Rash*, 520 U.S. at 962).[64] The court reasoned that if the "proposed disposition or use" language in §506(a) is to be afforded any significance, "the appropriate standard for valuing collateral must depend upon what is to be done with the property – whether it is to be liquidated, surrendered, or retained by the debtor." *Id.*

Citing *Rash's* holding that the value of property retained by the debtor under §506(a) is its replacement value, the Third Circuit highlighted the *Rash* court's clarification that it

---

[64] The *Heritage Highgate* court relied heavily on the Supreme Court's decision in *Rash,* but evidently found the legislative history of §506(a) more persuasive than the *Rash* court, which "[gave] no weight to the legislative history of §506(a), noting that it is unedifying, offering snippets that might support either standard of valuation." *Rash*, 520 U.S. at 963 n.4.

considered its use of the term replacement value to be consistent with the meaning of fair-market value, because both reflect the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition. *Id.* at 142 (citing *Rash,* 520 U.S. at 959 n.2). As a result, the Third Circuit concluded, "[t]he proper measure under §506(a) must therefore be the collateral's *fair market value because it is most respectful of the property's anticipated use." Id.* (emphasis added). The Third Circuit found the secured creditor's proposed valuation, based on what the court called a "market-based, or wait-and-see, approach to valuation," was inconsistent with the replacement value standard required under §506(a) and *Rash*. *Id.* The court found that valuation being guided by the "proposed disposition or use" of the collateral under §506(a) does not permit the time as of which it is valued to be postponed or altered; rather, it must be based upon realistic measures of the collateral's present worth. *Id.* at 142-43.

The import of the *Rash* and *Heritage Highgate* decisions to the Valuation Motion is clear. The Court must value the Property, which the Debtor proposes to retain and operate as the Museum, based on its replacement value, meaning the price a willing buyer in the Debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition.

### C.    Replacement Value is Determined Based on the Debtor's Actual Intended Disposition or Use

As discussed *supra, Rash* held that the collateral in the case before it was to be valued in light of the chapter 13 debtors' proposed retention and use of it to generate income, rather than based on a hypothetical foreclosure and sale. *Rash*, 520 U.S. at 963. The *Heritage Highgate* court reinforced this holding. 679 F.3d. at 132 ("[T]he appropriate standard for valuing collateral must depend upon what is to be done with the property – whether it is to be liquidated, surrendered, or retained by the debtor."). Both before and after the Third Circuit's decision in

*Heritage Highgate*, courts in the Third Circuit and beyond have understood *Rash* for the

principle that, in the context of valuation under §506(a), the debtor's proposed use or disposition

of the collateral guides its valuation.  *See, e.g., In re Casey*, 2013 WL 3808108, at *2 (Bankr.

M.D. Pa. July 22, 2013) (concluding it was consistent with *Rash's* adoption of the replacement

value approach to determine the fair market value of real property collateral in light of the

debtor's intended retention of the properties as indicated by his proposed plan); *In re McElwee*,

449 B.R. 669 (Bankr. M.D. Pa. 2011) (stating that "the proposed disposition or use of the

collateral is pivotal in determining the correct approach to valuation" and favoring the appraisals

of experts that valued a secured creditor's real estate collateral); *In re R&S Vinyl Prods. Grp.,*

*L.L.C.*, 291 B.R. 685, 687 (Bankr. W.D. Pa. 2003) (in rejecting the debtor's valuation of

collateral based on a liquidation value where the debtor intended to retain and use the collateral

to generate an income stream, finding that under *Rash* and its progeny in the Third Circuit the

debtor's current and prospective use of the collateral is the correct basis for use in a

determination of the amount of the lender's secured claim).

    *Rash* provided courts with definitive guidance on the application of §506(a)'s express

language, and both before and after *Rash* courts have disfavored or rejected valuation approaches

that disregard a debtor's proposed use or disposition of the collateral.  *See, e.g., Body Transit*,

619 B.R. at 828 ("In light of [§506(a)'s] statutory instruction, it is difficult to fully accept the

Debtor's premise that the proper valuation methodology is the liquidation value of its tangible

assets.  The Debtor intends to use its assets in order to reorganize as a going concern."); *In re*

*Brace*, 163 B.R. 274, 277 (Bankr. W.D. Pa. 1994) (rejecting an expert's appraisal of the chapter

12 debtors' property that valued it is a residence and hobby farm, rather than the debtors' present

and intended use as a working farm, reasoning that the debtors' current and prospective use is the

correct basis for the appraisal in determining the amount of the lender's secured claim); *Houston Sportsnet Finance, L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l Sports Network, L.P.)*, 886 F.3d 523, 533 (5th Cir. 2018) (finding that §506(a) and *Rash* require bankruptcy courts to value collateral based on the reorganized debtor's proposed use, and in reversing the bankruptcy court's valuation of an agreement because it was based on costs the debtor would not incur under the plan as actually proposed, stating that "The Agreement must be valued in light of the Plan, without recourse to hypothetical situations which are neither proposed nor likely in this Chapter 11 cramdown."); *In re Mayslake Village-Plainfield Campus, Inc.*, 441 B.R. 309, 320-21 (Bankr. N.D. Ill. 2010) (where the debtor proposed under its plan to retain, operate, and control the senior housing facility on its property, citing *Rash* in accepting expert's valuation of the property that reflected its worth if operated by a non-profit entity like the debtor, instead of competing expert's lower valuation if operated by a for-profit entity); *In re Watkins*, 240 B.R. 735, 741 (Bankr. C.D. Ill. 1999) (finding that a secured creditor's appraisal that valued the debtor's family farm on the assumption that the land would be divided and sold in separate lots was an improper method under *Rash* where the Chapter 12 debtors intended to retain the property under their confirmed plan).

In the same vein, courts have rejected §506(a) valuations that disregard the debtor's proposed disposition or use of the collateral in favor of a highest and best use approach, including in situations where a different hypothetical use yields a higher value. In *U.S. v. Donato (In re Donato)*, 253 B.R. 151 (M.D. Pa. 2000), the Court acknowledged that two lines of cases existed for purposes of valuing collateral under §506(a): "those giving more weight to a creditor's interest, by setting the highest and best use value and those giving more effect to the last sentence of §506(a) and assigning paramount importance to the debtor's proposed use of the

property."[65]  The cases the court cited as having employed the highest and best use approach

each pre-dated *Rash*, however, and the court found that in light of *Rash* an application of the

highest and best use valuation without regard to the debtor's proposed or intended use of the

collateral is improper.  *Id.* at 154-55.  The court therefore affirmed the bankruptcy court's

rejection of the Internal Revenue Service's valuation of the debtor's real estate as a subdivision,

rather than as a single plot, because it did not reflect the debtor's intended use.  *Id.* at 157.  *See

also McElwee*, 449 B.R. at 676 (in considering the competing valuation opinions of the parties'

experts with respect to a particular property, ascribing less weight to the opinion of an appraiser

who valued the property using a highest and best use approach, rather than valuing it considering

the debtors' intended use); *First Southern Nat'l Bank v. Sunnyslope Hous. L.P. (In re Sunnyslope

House. L.P.)*, 859 F.3d 637, 644-45 (9th Cir. 2017) (affirming the bankruptcy court's valuation of

the debtor's apartment complex based on the replacement cost the debtor would incur to acquire

a like property subject to the same restrictive covenants, and rejecting the secured creditor's

"highest and best use" valuation based on a hypothetical foreclosure that would eliminate the

restrictive covenants, finding that *Rash* "expressly instructs that a §506(a)(1) valuation cannot

consider what would happen after a hypothetical foreclosure – the valuation must instead reflect

the property's 'actual use'").

     The caselaw discussed *supra* makes clear that the debtor's intended use of the collateral

is determinative of the approach to value courts must take in §506(a) proceedings.  As such,

courts have found uncompelling the argument that "proposed disposition or use" refers only to

whether the debtor intends to surrender the collateral or retain it.  In *In re Bishop*, 339 B.R. 595

---

[65] This Court notes that, as the present dispute indicates, the "highest and best use" valuation
methodology may not always be in the creditor's interest.

(Bankr. D.S.C. 2005), the court resolved a chapter 12 debtor's motion to value a creditor's claim secured by the debtor's real property.  The debtor intended to maintain ownership of the property and use it as his residence, and therefore valued it for that use.  *Id.* at 597.  The secured creditor, on the other hand, valued the property to be repurposed as a broiler facility according to its highest and best use.  *Id.*  Looking to *Rash*, the court was "convinced that consideration must be given to the actual use proposed by Debtor . . . The Supreme Court's mandate that the consideration of the proposed use, and *not* the various dispositions or uses that *might* have been proposed, lends lesser credence to [the secured creditor's] appraisal, which contemplates a speculative use not intended by Debtor."  *Id.* at 600 (emphasis in original).  The court therefore accepted the debtor's appraisal, which was based on the debtor's intended use of the property. *Id.* at 602.  In doing so, the court rejected the secured creditor's argument that §506(a)'s "proposed disposition or use" language, as interpreted by *Rash*, means only whether a debtor intends to surrender or retain the collateral.  *Id.* at 599-600 (*citing In re Bell*, 304 B.R. 878 (Bankr. N.D. Ind. 2003)).  The court found this interpretation "excessively restrictive" and not in line with *Rash*'s statement that property is to be valued in light of the disposition or use in fact proposed, not "the various dispositions or uses that might have been proposed."  *Id.* at 600 (*citing Rash*, 520 U.S. at 964)).  The court concluded that *Rash* implied "a broader range of options than that of either retention or surrender of the collateral, as contemplated by the court in *Bell*."  *Id.  See also Farmers & Merchs. Bank v. Southall*, 475 B.R. 274, 277-78 (Bankr. M.D. Ga. 2012) (in affirming bankruptcy court decision to disregard expert opinion in §506(a) valuation dispute that failed to consider the debtor's actual use of the property as a farm, finding that it is required under *Rash* and rejecting the creditor's argument that §506(a)'s "proposed

disposition or use" requirement refers only to whether the debtor is going to surrender or retain
the collateral).

> **D.      Only Enloe Appraised the Property Based on its Replacement Value in
> Consideration of the Debtor's Actual Intended Use**

There is no dispute that under the Plan the Debtor proposes to retain the Property and to
continue operating the Museum.  Given that reality, *Rash, Heritage Highgate,* and the balance of
authority discussed above requires that, for purposes of the Valuation Motion, the Property is
valued according to its replacement value in light of its proposed use as a museum.  Although the
Court was presented at the Hearing with days of credible testimony from accomplished experts
in real estate appraisal, valuation, and investment, ultimately only Enloe provided the Court with
a valuation of the Property that reflects the standard the Court must apply.  Enloe's value-in-use
appraisal is consistent with the dictates of *Rash* and *Heritage Highgate* that the proposed
disposition or use of the collateral is of paramount importance in §506(a) valuations of collateral.

The Debtor and the B Bondholder argue that Enloe's value-in-use appraisal is not
consistent with *Rash* and *Heritage Highgate* because it does not reflect the market value of the
Property, i.e., the price a willing buyer in the debtor's trade, business, or situation would pay a
willing seller to obtain property of like age and condition.  Rather, they argue, only a valuation
that considers the highest and best use of the Property will produce its market value.  The Trustee
and A Bondholder agree that the Court is tasked with determining the market value of the
Property, but argue that under §506(A) and *Rash*, the determination of that value requires
application of the replacement value standard in light of the Debtor's intended retention and use
of the Property.

The Court agrees with the Trustee and A Bondholder.  The Debtor and B Bondholders'
argument fails to recognize the restriction that §506(a), as interpreted by *Rash* and *Heritage*

*Highgate*, places on the valuation of collateral to be retained by the Debtor. This Court reads

that authority to require valuation not based on a hypothetical disposition of the Property that is

not contemplated under the Plan, but rather on the Debtor's actual intended use of the Property.

The *Rash* court, in establishing replacement value as the appropriate measure of value under

§506(a), found it to be "the price a willing buyer *in the debtor's trade, business, or situation*

would pay a willing seller to obtain property of like age and condition." 520 U.S. at 960

(emphasis added). The Court understands this to require evaluation of the Property's fair market

value to a museum buyer seeking to purchase a similar asset in age and condition for use as a

museum, regardless of whether some other use would result in a higher or lower value. The

*Heritage Highgate* decision supports this understanding, explaining that the *Rash* court

"considered its 'use of the term replacement value . . . consistent with . . . the meaning of fair-

market value' because both reflect 'the price a willing buyer in the debtor's trade, business, or

situation would pay a willing seller to obtain property of like age and condition.'" *Heritage

Highgate*, 679 F.3d at 142 (citing *Rash,* 520 U.S. at 959 n.2). Therefore, while the Debtor is

correct in its argument that courts look to the fair market value of collateral to determine its

value for purposes of §506(a), they do so tethered to the requirement of §506(a) and *Rash* that

value is determined in light of the actual proposed disposition or use of the collateral. A

hypothetical highest and best use value may be preferable to determine an asset's value in other

contexts, but as the decisions discussed *supra* have found, the highest and best use standard does

not govern in §506(a) valuations where the debtor intends to retain and use the collateral.[66]

---

[66] The B Bondholders, in arguing that it is "equally clear that, 'when the purpose of an appraisal is to
develop an opinion of market value, highest and best use analysis identifies the most profitable,
competitive use to which the property can be put,'" cite several decisions that resolved valuation disputes
in contexts other than §506(a). See Bankr. Docket No. 411, at p. 20 (*citing Textron Fin.-New Jersey Inc.
v. Herring Land Grp., LLC*, 2011 U.S. Dist. LEXIS 70132 (D.N.J. June 29, 2011); *Olson v. U.S.*, 292
U.S. 246 (1934); and *Whitehouse Hotel L.P. v. Commissioner*, 615 F.3d 321 (5th Cir. 2010)). Given the

The B Bondholders argue that it is too narrow an interpretation of §506(a), *Rash*, and *Heritage Highgate* to find that they require the Court be guided by the Debtor's intended use of the Property to operate the Museum, rather than simply by its disposition (whether it is to be retained, surrendered, or liquidated).  In effect, the B Bondholders are making the same argument the *Bishop* and *Southall* courts rejected, i.e., §506(a)'s "proposed disposition or use" language, as interpreted by *Rash*, only requires the Court to focus on whether the Debtor intends to surrender the Property or retain it, and because the Debtor will retain it, the highest and best use then governs valuation, rather than a valuation based on the Debtor's actual intended use.[67]  Like the *Bishop* court, this Court finds the B Bondholders' argument inconsistent with *Rash,* as well as *Heritage Highgate.*  As the *Bishop* court stated, this interpretation is inconsistent with *Rash's* mandate that collateral be valued in accordance with its actual use, rather than the various dispositions or uses that might have been proposed.  *Bishop*, 339 B.R. at 600 ((*citing Rash,* 520 U.S. at 964)).  Whether *Rash* broadens or restricts §506(a) may be arguable, but what is not arguable is that it rejected valuations based on hypothetical uses or dispositions of property in favor of valuations reflecting intended use or disposition.  In *Rash* that hypothetical was a foreclosure sale of a truck, here it is sale of the Property for conversion of the Museum to an office building.  In both instances the hypothetical is inconsistent with §506(a)'s requirement that valuation be in light of the collateral's proposed disposition or use.

---

mandates of §506(a), as interpreted by *Rash* and *Heritage Highgate*, this court finds these cases unpersuasive given their fundamental contextual difference.

[67] See Bankr. Docket No. 411 at p.21 ("[A]ny determination as to value should necessarily be made upon the highest and best use of the Real Property in light of the Debtor's intention to retain the same.  This, in turn, would necessitate calculation of the Real Property's value at its highest and best use, which, based upon the evidence presented and testimony elicited at the Hearings, is an adaptive reuse of the Real Property as commercial office space.").

It should not come as a surprise, given the Court's discussion above, that despite their credible testimony and reports, the Court will not afford any weight to the appraisals performed by Lukens and Silverman.  Both appraisals, whether by choice or at the direction of their respective clients, valued the Property under a highest and best use assumption, rather than valuing it as the museum it is and is intended to be.  As discussed, the Court finds that standard does not apply in the context of §506(a) valuations.  The Court therefore need not engage in an analysis of the merits of Lukens' and Silverman's respective valuations under either the sales comparison approach or the income capitalization approach.  Nor will the Court further discuss the opinions of Adler and Balderston, which, while not valuations, were offered in support of the Debtor's valuation of the Property as a repositioned office building.[68]

Consequently, the Debtor has failed to carry its initial burden of calling into question the value of the Trustee's asserted secured claim, as required under *Heritage Highgate*.  As a result, the burden never shifted to the Trustee and the A Bondholder to prove the value of the Property.  Notwithstanding the Debtor's failure, however, the value of the Property remains at issue because the Trustee's Proof of Claim does not state the asserted value of the Property securing the claim.[69]  Under *Heritage Highgate,* if the Proof of Claim had set forth a value that amount would have been the value that the Court was required to accept.  The Debtor contended in the Valuation Motion that the Trustee believes the value of the Property is $29,900,000.00, while the Trustee and the A Bondholder asserted at the Hearing that the value is $66,000,000.00.  The Court therefore believes a full analysis of Enloe's valuation, which values the Property under the

---

[68] In giving no weight to the Lukens and Silverman valuations and the Adler and Balderston testimony, the Court does not adjudge these experts' testimony and reports to be valueless.  Their candid and credible testimony and reports helped the Court better understand the various valuation approaches and frame the law in its own mind.

[69] See Proof of Claim No. 25 (leaving blank the value of the property in Question 9).

applicable standard, is appropriate in order to determine the Property's value.  Moreover, the

value of the Property is central to whether the Debtor's Plan, as currently proposed, can be

confirmed.

The Court now turns back to Enloe's value-in-use appraisal.  Having appropriately

started with the methodological assumption that the Property will be used to operate the

Museum, Enloe performed a credible and thorough valuation relying primarily on the cost

approach to determine the Property's replacement value.  The Court is satisfied that Enloe's

application of the cost approach was, under the circumstances, the most suitable valuation

approach to apply.  Each of the valuation experts agreed that the Property constitutes a special

purpose property for which there exists little or no sales market, and therefore little or no

comparable sales data to analyze in valuing the Property as a museum.  Enloe attempted to find

nationwide comparable sales of museums to perform a sales comparison approach, but the dearth

of transactions left him with inconclusive results.  He therefore applied the cost approach, which

was consistent not only with the vast majority of his prior valuations of special purpose

properties generally, but also with each of his prior valuations of museums in particular.

Moreover, the Court finds compelling the testimony of both Lyon and Silverman that the cost

approach is the preferred method of valuation for special purpose properties, for which market

sales data is sparse, and that they either did employ (Lyon) or ideally would have employed

(Silverman) the cost approach in valuing the Property.  Moreover, bankruptcy courts have found

the cost approach to be a reliable indicator of value for special purpose properties lacking a

source of comparable sales data.  *See e.g., In re Motors Liquidation Co.*, 576 B.R. 425, 425

(Bankr. S.D.N.Y. 2017); *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, at *8 (Bankr. S.D.

Miss. Apr. 4, 2011); *In re Hand*, 2009 WL 1306919, at *15 (Bankr. D. Mont. May 5, 2009).

The Court is also satisfied that Enloe's calculation of value using the cost approach was rigorous and reliable.  Enloe's valuation of the Property's land was based on a reasonable sales comparison approach that has not been challenged.  Enloe's valuation of the Property's improvements, based on their replacement cost minus depreciation, was likewise reasonable. Faced with a lack of market data, Enloe used three different sources of data to determine the replacement value of the Museum improvements: (i) the Marshall Valuation Service's cost manual, (ii) the construction costs of the National Spy Museum, and (iii) the construction budget of the developer that built the Museum.  Enloe's use of cost estimates from the Marshall Valuation Service to calculate total direct replacement costs of $368.37 per square foot went unchallenged and based on the testimony the Court finds it to be a reliable method.  Likewise, Enloe's use of the Museum's construction budget to calculate replacement costs of $914.52 per square foot went unchallenged.[70]  With respect to the Enloe's use of the construction costs of the Spy Museum, calculated to be $680.90 per square foot, the Debtor argues that Enloe's figure is erroneous because it underestimates that museum's square footage, and consequently overestimates the construction cost per square foot.  However, as discussed in footnote 52 *supra,* the Court was not presented with evidence that the square footage Enloe used was incorrect, and therefore rejects the Debtor's assertion that his cost calculation is too high.  Considering the three replacement cost figures he drew from the data, Enloe estimated an as-new replacement cost of $600 per square foot, which the Court finds to be a reasonable reconciliation of the data Enloe used.

---

[70] At the Hearing, Debtor's counsel questioned Enloe as to the omission in the budget and Enloe's report of a figure of $142,000,000.00 as the total cost of the Museum.  Enloe testified that his total cost figure is not $142,000,000.00 because that figure reflected what he viewed as non-real estate items, resulting in him making an adjustment to the total cost figure he used.  Hearing Transcript, 747:1 to 747:6.

The Debtor's chief basis for questioning Enloe's replacement cost calculation, however, is his method of extracting depreciation.  Enloe testified that because there is insufficient market data for museum properties from which to extract depreciation figures, he used the well-accepted method of extracting depreciation based on the economic age-life of the Property.  The Debtor argues, and cites Lukens' testimony in support, that USPAP requires depreciation to be calculated from market data, and therefore Enloe's use of the economic age-life method based on the Marshall Valuation Service is improper.

Although none of the Parties offered the relevant provision of USPAP into evidence, Lukens testified that Standards Rule 1-4(b) is the applicable rule on which he is relying.[71]  He testified that that the Rule provides that "when the cost approach is necessary for a credible assignment result[], an appraiser must . . . analyze such comparable data as are available to estimate the difference between the costs new and the present worth of the improvements . . . ."[72] The Trustee and A Bondholder counter argue that this Rule does not require use of market data where no such market data exists.  The Court agrees that the rule on which Lukens relies does not seem to be as absolute as Lukens seems to understand it.  Lukens' own testimony was that the rule requires the analysis of comparable cost data to estimate the cost new of improvements and the depreciation "as are available."  Lukens acknowledged this qualifier when testifying, but asserted that using the cost approach when comparable sales data is not available "becomes … a problem because then, you know, you have to do a definitive search that says there are absolutely no sales and it's pretty hard to establish that."[73]  The other experts who testified regarding the

---

[71] Hearing Transcript, 215:2 to 215:14; 216:5 to 217:8.

[72] Hearing Transcript, 216:5 to 216:21.

[73] Hearing Transcript, 216:22 to 217:8.

cost approach method, however, did not view the lack of market data as precluding application

of the cost approach.  Rather, their testimony was that it is the typical method used when there is

no market for sales, with depreciation extracted by the economic age-life method.  It therefore

appears to the Court that Lukens' understanding of USPAP Standards Rule 1-4, while possibly

guiding his own appraisal practice, does not reflect the text of the rule or the universal practice of

his fellow appraisers.  The Court therefore concludes that Enloe's method of calculating the

depreciation of the Property by the economic age-life method was permissible.

The Court also finds that Enloe's calculation of the Property's depreciation by the

economic age-life model was reliable.  His explanation of the Marshall Valuation Service as the

basis for calculating physical and functional depreciation of 9.4% was reasonable.  As for

depreciation based upon external obsolescence, including the COVID-19 pandemic, Enloe

testified that he did not consider this in his analysis because his value-in-use appraisal values the

land and building improvements based on a cost approach, without consideration of business

operations.[74]  The Debtor argues that this constitutes a flaw in his depreciation approach.[75]  The

Court, however, was not presented with any evidence that Enloe was required to account for the

COVID-19 pandemic as external obsolescence that reduces the Property's value.  While Lyon

testified that the COVID-19 pandemic is a form of external obsolescence, he did not testify that

it would or had to result in increased depreciation of the Property in particular.  Furthermore,

even if it had been provided with such evidence, the Court was not presented with evidence as to

---

[74] Hearing Transcript, 752:22 to 753:2; 757:17 to 757:20; 758:3 to 758:24.

[75] The Court believes that it is important to note that because Enloe valued the Property at
$66,000,000.00, and the Trustee's secured claim is approximately $31,000,000.00, any flaw in Enloe not
including external obsolescence based on the COVID-19 pandemic would need to result in a reduction of
the Property's value by at least $35,000,000.00 (*i.e.*, a further reduction for depreciation in excess of
50%) in order to call into question whether the Trustee's claim is fully secured.

how to calculate any additional depreciation of the Property based on the COVID-19 pandemic.[76]  The Court therefore has no basis to find that Enloe erred in his determination that the COVID-19 pandemic, though considered, did not warrant an additional depreciation calculation as external obsolescence impacting the Property's value.

Having determined that Enloe's value-in-use appraisal was the correct valuation model, that his cost approach was an appropriate method to determine the Property's replacement value, and that the inputs of his cost approach were reasonable and reliable, the Court agrees with Enloe's appraisal of the Property's value of $66,000,000.00.  Such value will therefore serve as the value of the Property for purposes of the Valuation Motion.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that the value of the Property for purposes of §506(a) is $66,000,000.00.  An Order consistent with this Opinion will be entered.

Dated:  December 4, 2020

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

---

[76] In his post-pandemic 2020 update of his 2019 appraisal, Silverman concluded that the market value of the Property had declined 10%, which the Court understands Silverman to believe is attributable entirely or primarily to pandemic-related effects on the commercial real estate market.  These effects, however, were in the nature of a longer absorption period, higher tenant improvement costs, and shortened lease terms, all resulting in Silverman calculating increased lease-up costs in connection with his income capitalization approach.  The Court believes that, even if it had been established that Enloe was required to increase the Property's depreciation to account for the pandemic, it would be inappropriate to apply the 10% reduction Silverman calculated.