# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: MUSEUM OF AMERICAN JEWISH HISTORY D/B/A NATIONAL MUSEUM OF AMERICAN JEWISH HISTORY, | CIVIL ACTION |
| Debtor. | NO. 20-6341 |
| MUSEUM OF AMERICAN JEWISH HISTORY, Appellant, | |
| v. | |
| UMB BANK, N.A., DIME COMMUNITY BANK, Appellees. | |

## MEMORANDUM OPINION

This appeal arises from the bankruptcy of the Museum of American Jewish History ("the Museum"), which operates the National Museum of American Jewish History. On appeal, the Museum contends that the Bankruptcy Court erred in its valuation of the museum building and land beneath it ("the Property") for purposes of 11 U.S.C. § 506(a). For the following reasons, the Bankruptcy Court's decision will be affirmed.[1]

### I.    BACKGROUND AND PROCEDURAL HISTORY

In 2005, the Museum announced that it would move to its current address on South Independence Mall East in Philadelphia. From 2006 to 2010, the Museum purchased 0.51 acres of land at this address, demolished the office building then standing on the land, and constructed a new museum building which opened to the public upon completion. The Museum purchased

---

[1] After examining the parties' briefs and the record on appeal, oral argument is deemed unnecessary because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." Fed. R. Bankr. P. 8019(b)(3).

the land for $9,505,000 and spent at least at least $83,000,000 to construct the new building, which was partially financed with a construction loan from TD Bank, N.A. In 2015, the Museum refinanced this construction loan through two series of revenue bonds issued by the Philadelphia Authority for Industrial Development, including (1) Series 2015A, issued in the principal amount of $17,000,000 and held by Appellee Dime Community Bank (formerly, BNB Bank); and, (2) Series 2015B, issued in the principal amount of $13,750,000 and held by a group of individuals, trusts, and foundations. The Museum's obligations pursuant to various agreements and promissory notes executed in connection with the bond issuances were secured by a mortgage lien on the Property executed in favor of the Indenture Trustee, TD Bank. In 2019, Appellee UMB Bank, N.A. replaced TD Bank as Indenture Trustee.

On March 1, 2020, the Museum filed a petition under Chapter 11 of the Bankruptcy Code. UMB Bank filed a Proof of Claim in the bankruptcy proceedings asserting a secured claim in the amount of $31,068,209.23 on behalf of the Series A bondholders. After filing several versions of its reorganization plan, the Museum proposed its Fourth Amended Plan for confirmation by the Bankruptcy Court. Per the Plan, the Museum proposes to retain and continue to operate the Property as a museum, pay Dime Community Bank approximately $6,500,000, and pay $100,000 to the remaining bondholders.

On July 23, 2020, the Museum a filed a motion to determine the value of the Property pursuant to Bankruptcy Rule 3012 and 11 U.S.C. § 506. Under the latter provision, a creditor's claim is secured only to the extent of the value of the property securing the claim, and such valuation must be "determined in light of . . . the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). The Motion explained, "[b]ecause the parties ascribe vastly different values to the Real Property, the value of the Real Property is a critical issue with respect to

confirmation of a plan." The Bankruptcy Court held a six-day hearing on the Motion, hearing testimony from six expert witnesses and two fact witnesses and receiving various appraisal reports into evidence. The valuations of two specific appraisers using different methods discussed in greater detail below are at the heart of the Museum's case on appeal: the appraisal of Reeves Lukens for the Museum, concluding that the Property was worth $10,500,000; and the appraisal of Eric Enloe for Appellees, concluding that the Property was worth $66,000,000.

By decision and order dated December 4, 2020, the Bankruptcy Court adopted Enloe's valuation of the Property, concluding that "only Enloe provided the Court with a valuation of the Property that reflects the standard the Court must apply" by appraising the Property based on the Museum's proposal to continue to use it as a museum, rather than an alternative use. The Museum now appeals, requesting that the Bankruptcy Court's valuation be vacated and the case remanded with instructions to disregard Enloe's appraisal and determine the value of the Property based on other evidence adduced at the hearing.

## II. STANDARD OF REVIEW[2]

---

[2] District courts "have jurisdiction to hear appeals from final judgments, orders, and decrees" of the bankruptcy courts. 28 U.S.C. § 158(a)(1). The Third Circuit has not addressed if an order determining the value of property under Section 506(a)(1) is a final order appealable as of right, but has explained that finality is interpreted "pragmatically in bankruptcy cases because these proceedings often are protracted and involve numerous parties with different claims" and to "delay resolution of discrete claims until after final approval of a reorganization plan . . . would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988) (citations omitted).

Consistent with the Third Circuit's pragmatic approach, other courts have held that an "order determining the value of property pursuant to 11 U.S.C. § 506(a) is a final order for purposes of appeal if the valuation was made for purposes of plan confirmation." *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 45 (B.A.P. 6th Cir. 2012) (citations omitted); *see also In re Travelers Motor Inn, Inc.*, 181 B.R. 6, 7 (N.D.N.Y. 1995) (valuation is final order when "made in conjunction with and for the purpose of plan confirmation" (citation omitted)); *In re Rodriguez*, 272 B.R. 54, 57 (D. Conn. 2002) (order final where court held "legal conclusion about how the value of the security interest should be calculated" prior to confirmation); *In re Jablonski*, 88 B.R. 652, 655 (E.D. Pa. 1988) (same).

Here, the Bankruptcy Court determined the value of the Property under Section 506(a)(1) for purposes of its consideration of the confirmation of the Museum's reorganization plan. The valuation order therefore is an appealable order and jurisdiction is proper pursuant to 28 U.S.C. § 158(a)(1).

On appeal from a decision of the bankruptcy court, legal conclusions are reviewed *de novo*, factual findings are reviewed for clear error, and exercises of discretion are reviewed for abuse of discretion. *In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999) (citation omitted). "A factual finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (internal quotation marks and citation omitted). While the legal conclusions of the Bankruptcy Court under Section 506(a) are therefore reviewed *de novo*, factual findings made in applying these legal conclusions are reviewed for clear error. *See, e.g.*, *In re Creekside*, 477 B.R. at 45-46; *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 799 (5th Cir. 1997); *In re Heritage Highgate, Inc.*, 449 B.R. 451, 455 (D.N.J. 2011), *aff'd*, 679 F.3d 132 (3d Cir. 2012).

### III.    DISCUSSION

"Chapter 11 of the Bankruptcy Code strikes a balance between two principal interests: facilitating the reorganization and rehabilitation of the debtor as an economically viable entity, and protecting creditors' interests by maximizing the value of the bankruptcy estate." *In re Phila. Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir. 2010) (citations omitted). Although judicial confirmation of a proposed Chapter 11 plan of reorganization generally requires the "unanimous acceptance by all of the impaired classes," *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 511 (3d Cir. 2005) (citing 11 U.S.C. § 1129(a)(8)), the Bankruptcy Code also "provides circumstances under which a reorganization plan can be confirmed over the objection of secured creditors – a process referred to as a 'cramdown' because the secured claims are reduced to the present value of the collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to accept less than the full value of its claim and thereby allowing the plan to be

4

crammed down the throats of objecting creditors," *In re Phila. Newspapers*, 599 F.3d at 304 (internal quotation marks and citations omitted).

Section 506(a) of the Bankruptcy Code governs the value of a secured claim, "bifurcat[ing] claims into secured and unsecured claims based on judicial valuation of the collateral securing the claim." *Id.* at 313 n.10. Pursuant to Section 506(a):

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). Although Section 506(a)'s first sentence requires that a "secured creditor's claim . . . be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral," it does not explain how such collateral is to be valued. *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 961 (1997). Section 506(a)'s second sentence "does speak to the *how* question," *id.*, however, directing that the value of a creditor's secured claim "shall be determined in light of . . . the proposed disposition or use" of the property.

In *Rash*, the Supreme Court addressed the application of Section 506(a) where a debtor's bankruptcy plan filed under Chapter 13 proposed to retain a truck secured by the lien of a creditor, holding that the truck could not be valued based on the value a creditor could recover if the truck were placed in foreclosure proceedings because this would be inconsistent with the debtor's "proposed disposition or use" of the truck. *Id.* at 956-57, 962. In so holding, the Court set out a specific framework for the valuation of secured property where, as here, a debtor proposes to retain and continue using the property.

5

Case 20-11285-mdc Doc 583-1 Filed 04/06/26 Entered 04/06/21 Page 16 of 12 Desc Main
Case 2:20-cv-06358-WB Document 26 Filed 04/28/21 Page 6 of 12
Document    Page 6 of 12

Pursuant to *Rash*, determination of the proper standard to value property under Section 506(a) looks first to the debtor's proposed disposition and use of the property. *Id.* at 962. As the Court explained, this is because "the 'proposed disposition or use' of the collateral is of *paramount* importance to the valuation question" under Section 506(a). *Id.* (emphasis added). The Court went further, however, specifying the exact standard to be applied where a debtor proposes to retain and use secured property: to wit, the "replacement-value standard." *Id.* at 962-63. Under this standard, the Court explained, value of property under Section 506(a) is "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Id.* at 959 n.2 & 960. The Court explained that this definition was "consistent," not incompatible, with the "fair-market value" standard used by the Ninth Circuit, *id.* at 959 n.2, which defined fair market value as "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time," *In re Taffi*, 96 F.3d 1190, 1192 (9th Cir. 1996). By contrast, however, *Rash*'s formulation of the replacement value standard focused on "the price a willing buyer in the debtor's trade, business, or situation would pay," and not just on any willing buyer in an open market for the property to be valued. *Rash*, 96 F.3d at 959 n.2. Although *Rash* explained that the replacement value standard applied, it left the method of determining replacement value to the discretion of the bankruptcy courts:

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property.

*Id.* at 965 n.6.

After *Rash*, in *In re Heritage Highgate, Inc.*, the Third Circuit addressed the valuation of

6

a debtor's residential development which secured the claim of a creditor where the debtor's plan filed under Chapter 11 proposed to retain the property and continue to develop and sell homes. 679 F.3d 132, 137-38 (3d Cir. 2012). Two specific methods of valuation were at issue: while the creditor contended that the property should be valued based on the debtor's "projected budget" which "anticipated full payment" of claims via continued development and sale of homes, the bankruptcy court concluded that "the fair market value of the [development] as of the plan's confirmation date" controlled. *Id.* at 137-38. The Third Circuit agreed with the bankruptcy court's determination, holding that the "proper measure under § 506(a) must [] be the collateral's fair market value because it is most respectful of the property's anticipated use," which in that case was for the debtors "to retain ownership of the real estate subdivision in order to complete its development." *Id.* at 142-43. In endorsing fair market value for purposes of the valuation of the residential development, however, the Third Circuit did not disturb the Supreme Court's conclusion that Section 506(a) requires valuation under the replacement value standard where a debtor proposes to retain and use secured property. On the contrary, *In re Heritage* reiterated *Rash*'s holding that "under § 506(a), the value of property retained is the cost the debtor would incur to obtain a like asset for the same proposed use, *i.e.,* its replacement value," recognized that *Rash*'s reasoning "applies with equal force in the Chapter 11 reorganization context," and explained that "the *Rash* Court considered its use of the term replacement value consistent with the meaning of fair-market value because both reflect the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Id.* at 141-42 (internal quotation marks, ellipses, and citations omitted).

Here, consistent with *Rash* and *In re Heritage* the Bankruptcy Court looked first to the Museum's "proposed disposition or use" of the Property, and determined that the Museum

7

proposed to retain and continue to operate the Property as a museum.  The Bankruptcy Court therefore correctly concluded that, under *Rash*, it must value the Property based on its replacement value: "the price a willing buyer in the Debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition."  And, concluding that expert valuations which failed to value the Property "as the museum it is and is intended to be" were inconsistent with the mandate of Section 506(a) as construed by *Rash*, the Bankruptcy Court concluded that only the appraisals which valued the Property as a museum could be adopted.  This, too, was correct (the proposed Plan's proposed disposition or use of the museum being of "paramount importance to the valuation question.").  *Rash*, 520 U.S. at 962.  "Section 506(a) calls for the value the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed."  *Id.* at 964 (citation omitted); *see also, e.g.*, *In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d 637, 644 (9th Cir. 2017) (rejecting a valuation premised on a property's "highest and best use," not its proposed use, as inconsistent with Section 506(a)).

       The Bankruptcy Court thus rejected Lukens's appraisal because it valued the Property under a "highest and best use" premise, which Lukens's expert report explained entails the valuation of a property based on its "use that is legally permissible, physically possible, and financially feasible which results in the highest value."  Concluding that the Property's highest and best use would be as a mixed-use office development and not as a museum, Lukens valued the Property as $10,500,000, relying on the sales prices and rental income of various buildings in Center City Philadelphia.  By contrast, the Bankruptcy Court found that Enloe's valuation "appropriately started with the methodological assumption that the Property will be used to operate the Museum" and proceeded to analyze Enloe's valuation, determining that he used the

"correct valuation model," an "appropriate method to determine the Property's replacement value," and "reasonable and reliable" inputs for the valuation approach he used. The Bankruptcy Court therefore adopted Enloe's valuation of the Property as $66,000,000.

On appeal, the Museum contends that the Bankruptcy Court "erroneously conclude[d] that Lukens, by considering the highest and best use of the Museum, failed to take into account that the Museum would be retained by the Debtor and would continue to be used as a museum." In actuality, however, Lukens testified that he valued the Property based on its highest and best use as an office building, and not on the premise that it would continue operating as a museum. He further testified that he considered the Property's continued use as a museum in determining the Property's highest and best use, but ultimately concluded that continuation as a museum would be a "lesser use and result in a lower value." And while Lukens concluded that the Property's value as a museum would be lower than its value as an office building, Lukens's final figure for the value of the Property was an appraisal based on the Museum's use as an office building. Indeed, Lukens testified that he never "put a specific number in [his] analysis on what it would be worth as a museum." On this record, the Bankruptcy Court was not clearly erroneous in finding that Lukens failed to value the Property as a museum.[3]

Finally, the Museum contends that the Bankruptcy Court erred as a matter of law by

---

[3] The Museum also argues that the Bankruptcy Court erred in rejecting Lukens's "highest and best use" valuation of the Property as an office building because this valuation produced a figure that was *higher* than if Lukens had valued the Property as a museum, and thus would benefit Appellees should the Museum's plan be confirmed in a cram-down over Appellees' objection. The Museum's argument that it "was entirely appropriate, and indeed necessary, for Lukens to determine the highest and best use of the Property," is entirely reliant on cases which did not consider "highest and best use" valuations in the context of Section 506(a)(1). These cases are therefore inapposite. But, to state its holding once again, *Rash* recognized as a statutory mandate the rule that property be valued "in light of the disposition or use in fact proposed, not the various dispositions or uses that might have been proposed," and neither *Rash* nor *In re Heritage* limited this rule's application to situations where a party's self-serving valuation premised on a property's alternative use would be advantageous to the party proffering the valuation. *Rash*, 520 U.S. at 964 (internal quotation marks and citations omitted).

9

adopting Enloe's valuation of the Property because his appraisal valued the Property based on the Property's "value-in-use" to the Museum.[4] As the Bankruptcy Court found, Enloe "performed a value-in-use appraisal," which Enloe in his expert report defined as "[t]he value of a property assuming a specific use, which may or may not be equal to market value but is different conceptually."[5] On appeal, the Museum contends that Enloe's "value-in-use" premise violated the requirement of *Rash* and *In re Heritage* that a property's valuation be based on its "fair market value," and therefore that the Bankruptcy Court "applied the wrong legal standard" to value the Property.

For several reasons, the Museum fails to establish legal error here. First, although Enloe's appraisal distinguished between two different *approaches* to valuing the Property – that is, between "market value" and "value-in-use" – it does not follow from the Bankruptcy Court's adoption of Enloe's "value-in-use" appraisal that the Bankruptcy Court applied the wrong legal standard under Section 506(a). While *Rash* holds that Section 506(a) requires that bankruptcy courts apply the replacement value standard when a debtor proposes to retain and continue to use the property to be valued, it leaves to the discretion of bankruptcy courts "as triers of fact [the] identification of the best way of ascertaining replacement value on the basis of the evidence presented." *Id.* at 956, 965 n.6. In short, *Rash* makes a conceptual distinction between the standard to be used – replacement value – and the methods or approaches used to determine a

---

[4] For the first time in its reply brief, the Museum seeks reversal and remand of the Bankruptcy Court's order on the grounds that the Enloe Appraisal failed to "make appropriate adjustments for functional obsolescence" or "consider external obsolescence." The Museum mentioned in passing this purported flaw in its factual recitation in its initial brief but explicitly stated that the Court "need not consider [it] in any detail," focusing instead on Enloe's reliance on the 'value-in-use' premise. The Museum therefore has waived review on this ground. *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 53 (3d Cir. 2016) (arguments waived where raised for first time in a reply brief).

[5] Enloe's expert report defined "market value" as "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."

10

property's replacement value. Enloe's "value-in-use" premise is simply one approach to ascertaining replacement value, and *Rash* left it within the Bankruptcy Court discretion to accept or reject it on the basis of the evidence presented by both parties. Indeed, *Rash* explicitly recognized that different forms of replacement value could be used depending on the facts of the case. *See id.* at 965 n.6 ("Whether replacement value is the equivalent of retail value, wholesale value, *or some other value* will depend on the type of debtor and the nature of the property" (emphasis added)).

Relying on Enloe's methodological distinction between "value-in-use" and "market value," the Museum argues that the Bankruptcy Court failed to value the Property based on its "fair market value" as required by *Rash* and *In re Heritage*. As discussed, however, the Bankruptcy Court correctly held that the Property should be appraised based on the replacement value standard, "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Id.* at 959 n.2. The Bankruptcy Court explained that Enloe testified that "his value-in-use appraisal is premised on continued use of the Property as a museum, which he understood is the Debtor's intention." A valuation premised on value-in-use – per Enloe's expert report, and as found by the Bankruptcy Court, "[t]he value of a property assuming a specific use" – is entirely consistent with the replacement value standard because it values property based on the paramount consideration in the Section 506(a) context: the property's "proposed disposition or use." The Museum cites no case holding to the contrary.[6] And although caselaw has seldom addressed the viability of "value-in-use"

---

[6] The Museum cites various cases addressing property valuation for purposes of tax assessments which the Museum contends distinguish between appraisals based on fair market value and value-in-use. *See, e.g.*, *F & M Schaeffer Brewing Co. v. Lehigh Cty. Bd. of Appeals*, 530 Pa. 451, 457-58 (1992) ("Because value-in-use is based on the use of the property and the value of that use to the current user, it may result in a higher value than the value in the marketplace. Value-in-use, therefore, is not a reflection of fair market value and is not relevant in tax assessment cases because only the fair market value (or value-in-exchange) is relevant in tax assessment cases" (citations omitted)); *F&L Realty Inc. v. Lackawanna Cty. Bd. of Assessment & Revision of Taxes*, 78 Pa.D.&C.4th 22, 39

11

appraisals under Section 506(a), in the sole case cited by the parties here which briefly addressed the issue, the court did not consider the "value-in-use" approach to be inconsistent with Section 506(a). *See In re Motors Liquidation Co.*, 482 B.R. 485, 494-95 (Bankr. S.D.N.Y. 2012) ("The Court can easily see uses for the 'value in use' mechanism . . . where the property has not been subjected to a sale process (especially one subject to higher and better offers), and remains in the hands of its original owner or a successor by means other than a sale").

IV.     **CONCLUSION**

For the foregoing reasons, the decision and order of the Bankruptcy Court will be affirmed. An appropriate order follows.

**BY THE COURT:**

/s/Wendy Beetlestone, J.
_____
**WENDY BEETLESTONE, J.**

---

(Com. Pl. 2005) (explaining in the tax assessment context, "[w]hen you improperly adopt value-in-use methodologies, you no longer value realty for any owner but to a specific use and a specific type of owner and therein lies the statutory error"). These cases are of no help to the Museum here, however, because Section 506(a) requires the valuation of property based on its "proposed disposition or use" and the price a willing buyer in the debtor's trade, business, or situation would pay, not based on the fair market value that the property could have to any party based on any alternative uses.

12